In re **DEEP VEIN THROMBOSIS.**

This Document Relates To: MSJ # 1 02–2997 04–2964 03–3181 03–3845 03–3849 03–4102 03–5186 04–0412 04–0438 04–0789 04–1022 04–1092, MSJ # 2 03–5144 04–1461 03–3760 04–0875 03–5234.

**MDL No. 04–1606 VRW.**

United States District Court,
N.D. California.

Feb. 14, 2005.

Michael S. Danko, Kristine K. Meredith, Stephen James Purtill, James Paul Collins, George W. Ellard, Niall G. Yamane, Gary L. Simms, O'Reilly Collins and Danko, San Mateo, CA, Brenda Dalila Posada, Gerald Carey Sterns, Sterns & Walker, Oakland, CA, Fred G. Meis, Quinton B. Cutlip, Meis & Alexander, Terry O'Reilly, O'Reilly Collins & Danko, San Francisco, CA, D. Michael Andrews, Beasley Allen Crow Methvin Portis & Miles, P.C., Montgomery, AL, Kenneth Ross Citti, Citti & Associates, Houston, TX, James H. Furman, Byrd Davis Eisenberg Walter & Furman, LLP, Austin, TX, James D. Clark, Clark & Greiwe, P.A., Tampa, FL, John C. Dabney, Jr., Johnson & Ward, C. Andrew Childers, Childers Buck & Schlueter, LLP, Atlanta, GA, A. Craig Eiland, Office of A. Craig Eiland, Galveston, TX, Tariq S. Hasan, Hasan & Associates, Clay Robbins, III, Magana Cathcart & McCarthy, Los Angeles, CA, Richard W. Kelly, Jr., Richards & Kelly, Warrendale, PA, Jonathan C. Reiter, Stephen Gibson Skinner, Broder & Reiter, New York, NY, Gregory Steven Spizer, Anapol Schwartz Weiss Cohan Feldman & Smalley, PC, Philadelphia, PA, for Plaintiffs.

Jerry L. Hull, La Jolla, CA, pro se.

Scott Ogan, Palmer, AK, pro se.

Janet Ogan, Palmer, AK, pro se.

Charles Lagrange Coleman, III, Devin C. Courteau, Lawrence James Conlan, Holland & Knight LLP, Samantha Davies Hilton, Stephen Craig Kenney, Kenney & Markowitz, LLP, Forrest Arthur Hainline, Peter Manfred Bransten, Pillsbury Winthrop LLP, Sara A. Simmons, Law Offices of Sara A. Simmons, San Francisco, CA, Kymberly E. Speer, Livingston Law Firm, Walnut Creek, CA, Rachel Giesber Clingman, Steven L. Roberts, William J. Boyce, Fulbright & Jaworski L.L.P, David J. Beck, Thomas E. Ganucheau, Beck Redden & Secrest, LLP, John F. Easton, Thad T. Dameris, Pillsbury Winthrop LLP, Houston, TX, Clinton Fuller Fletcher,

Robert B. North, Jr., Nelson Mullins Riley & Scarborough, Atlanta, GA, Mason H. Grower, III, David B. Blessing, Grower Ketcham Rutherford Bronson Eide & Telan, P.A., Orlando, FL, Richard Grotch, Coddington, Hicks & Danforth, Redwood City, CA, Roderick D. Margo, Scott David Cunningham, Jennifer J. Johnston, Kevin R. Sutherland, Frank Anthony Silane, Jeffrey D. Wolf, Condon & Forsyth LLP, John W. Shaw, Christopher M. McDonald, Sahw Terhar & Lamontagne LLP, Los Angeles, CA, Clem C. Trischler, Jr., Pietragallo Bosick & Gordon, Pittsburgh, PA, Benjamin E. Soffer, Chung H. Han, Ronald A. McIntire, Perkins Coie LLP, Santa Monica, CA, J. Chandler Bailey, Jere F. White, Jr., Sarah Warburton, Lightfoot Franklin & White LLC, Birmingham, AL, Adam N. Steinman, Steve Y. Koh, Perkins Coie LLP, Seattle, WA, Wendolyn S. Busch, Mechanik Nuccio Williams Hearne & Wester, P.A., Lutz, FL, Diane Westwood Wilson, Condon & Forsyth, New York, NY, Jeffrey Alfred Worthe, John R. Hanson, Ferruzo & Worthe, LLP, Newport Beach, CA, Elaine D. Solomon, David N. Zeehandelaar, Blank Rome LLP, Philadelphia, PA, for Defendants.

### ORDER

WALKER, Chief Judge.

Before the court are defendant Boeing Company's (Boeing) motions for summary judgment on plaintiffs' state law claims for product liability, negligence and breach of warranty. Docs # 56, 63. Plaintiffs concede that judgment should be entered in favor of Boeing on all breach of warranty claims. Doc # 94 at 17.

Plaintiffs, however, oppose Boeing's motions as they relate to the claims for product liability and negligence. Docs # 94, 95. The court heard oral arguments on these motions on January 13, 2005. After reviewing the parties' memoranda and the applicable law, the court GRANTS Boeing's motions for summary judgment in their entirety.

I

Plaintiffs in these seventeen cases are similarly situated: All developed deep vein thrombosis (DVT) after traveling on either a domestic or international flight. DVT is a medical condition that occurs when a blood clot (thrombus) forms in a deep vein, usually in the leg. DVT can cause serious complications if the thrombus breaks off and lodges in the brain, lungs or heart, causing severe damage to that organ. See *http:// www.nlm.mih.gov/medlineplus/ency/article/00156.htm*. Each of the aircraft plaintiffs traveled on was manufactured by Boeing and sold directly to the airline. Plaintiffs have brought suit against the airlines and Boeing, alleging that the seating and seating configuration on each of the aircraft was dangerous and defective so as to create a risk of developing DVT through prolonged and cramped seating. Only the claims against Boeing are addressed in the current motion.

In twelve of these seventeen cases, Boeing admits that it manufactured the aircraft in question, Doc # 56, but asserts that it is not in the business of airline seating and thus delivered the manufactured aircraft to the airline with no installed seating. In the words of Boeing, "[we] did not design, manufacture, install, configure, select, sell, purchase or otherwise have any contact with the subject seats." Id at 1. Boeing offers the airlines' responses to plaintiffs' interrogatories to show that, in such cases, the airlines selected and purchased seats directly from a seat manufacturer, such as Recaro Seating or B/E Aerospace. Id at 2–3; Doc # 59, Exs B–H (airline responses); Doc # 60, Exs G–O (same); Doc # 61, Ex P (same). After the seats were ordered and received, the airlines either installed the seats them-

selves or contracted for installation of the seta by another party. Doc # 56 at 2–3. Boeing claims that it "had no contact with the allegedly defective seats" and thus "there is absolutely no basis for holding Boeing liable." Doc # 104 at 1. Nevertheless, plaintiffs assert product liability and negligence claims against Boeing in these twelve cases.

Boeing moves for summary judgment in its favor (MSJ # 1). Plaintiffs oppose MSJ # 1, arguing that genuine issues of material fact exist regarding whether Boeing (1) was involved in the seat design and manufacturing process or (2) refurbished or replaced the seats after they were originally installed. Doc # 94 at 4.

In the remaining five cases, Boeing admits that it not only manufactured the aircraft, but also installed the allegedly defective seating. Doc # 63 at 1. Boeing claims, however, that it was the airlines, not Boeing, that "selected and purchased the seats from a seat manufacturing company." Doc # 106 at 1. The airlines simply "requested that Boeing fasten the seats to the aircraft in accordance with the airline's chosen FAA-approved configuration." Id. To support this assertion, Boeing again offers the airlines' responses to plaintiffs' interrogatories. Doc # 68, Exs B–G (airline responses). Boeing also offers the declaration of Daniel Freeman, Senior Manager of Boeing's Interiors Group, in which Freeman states that "[w]here Boeing is requested to install seats before delivery of the aircraft, the airline selects the manufacturer and model of seats, purchases the seats, and delivers them to Boeing for installation" in accordance with a configuration determined by the airline. Doc # 71 (Freeman Decl) at ¶ 16.

Because it is only an "installer" of the seats, Boeing claims that it cannot be held liable for the alleged defective condition of the seats; it can only be held liable for negligent installation, a claim plaintiffs do not assert. Doc # 63 at 7–8. In its summary judgment motion, Boeing cites cases from each of the jurisdictions in which plaintiffs reside that stand for "this basic [legal] principle where the defendant installed an allegedly defective product." Doc # 106 at 4; Doc # 63 at 8–15 (case law). Accordingly, Boeing moves for summary judgment in these five cases arguing that it is entitled to judgment as a matter of law (MSJ # 2). Doc # 63. Plaintiffs oppose MSJ # 2 arguing, as with MSJ # 1, that genuine issues of material fact exist as to Boeing's "non-involvement in the seat design/manufacturing process" and whether Boeing "replaced or refurbished" the seats after installation. Doc # 95 at 5.

Finally, pursuant to FRCP 56(f), plaintiffs assert that if they were given an opportunity to obtain further discovery from Boeing, they would be able to produce evidence sufficient to raise a genuine issue of material fact. Doc # 89.

To these issues the court now turns.

## II

### A

In reviewing a summary judgment motion, the court must determine whether genuine issues of material fact exist, resolving any doubt in favor of the party opposing the motion. "[S]ummary judgment will not lie if the dispute about a material fact is 'genuine,' that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Id.* And the burden of establishing the absence of a

genuine issue of material fact lies with the moving party. *Celotex Corp. v. Catrett,* 477 U.S. 317, 322–23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Summary judgment is granted only if the moving party is entitled to judgment as a matter of law. FRCP 56(c).

The nonmoving party may not simply rely on the pleadings, however, but must produce significant probative evidence, by affidavit or as otherwise provided in FRCP 56, supporting its claim that a genuine issue of material fact exists. *TW Elec. Serv. v. Pacific Elec. Contractors Assn.,* 809 F.2d 626, 630 (9th Cir.1987). The evidence presented by the nonmoving party "is to be believed, and all justifiable inferences are to be drawn in his favor." *Anderson,* 477 U.S. at 255, 106 S.Ct. 2505. "[T]he judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Id* at 249, 106 S.Ct. 2505.

The evidence presented by both parties must be admissible. FRCP 56(e). Conclusory, speculative testimony in affidavits and moving papers is insufficient to raise genuine issues of fact and defeat summary judgment. *Thornhill Publishing Co., Inc. v. GTE Corp.,* 594 F.2d 730, 738 (9th Cir. 1979). Hearsay statements found in affidavits are inadmissible. *Japan Telecom, Inc. v. Japan Telecom America, Inc.,* 287 F.3d 866, 875, n. 1 (9th Cir.2004).

### B

■ Whether to allow further discovery under Rule 56(f) is a subject committed to the district court's discretion. *Nidds v. Schindler Elevator Corp.,* 113 F.3d 912, 920 (9th Cir.1996). In considering such a request, the stage of the litigation is an important consideration. For example, if the movant has failed diligently to pursue discovery in the past, the court has discretion to deny the Rule 56(f) application. *Id.*

Likewise, when "a summary judgment motion is filed * * * early in the litigation, before a party has had any realistic opportunity to pursue discovery relating to its theory of the case, district courts should grant any Rule 56(f) motion fairly freely." *Burlington Northern Santa Fe Railroad Co v. Assiniboine & Sioux Tribes of the Ft. Peck Reservation,* 323 F.3d 767, 773 (9th Cir.2003). Additionally, the Rule 56(f) application must be made before the summary judgment hearing. *Ashton–Tate Corp. v. Ross,* 916 F.2d 516, 520 (9th Cir. 1990).

■ The party seeking a Rule 56(f) continuance should demonstrate that: (1) it has set forth in affidavit form the specific facts that it hopes to elicit from further discovery; (2) the facts sought actually exist; and (3) these sought-after facts are essential to resist the summary judgment motion. *California v. Campbell,* 138 F.3d 772, 779 (9th Cir.1998).

### III

*MSJ # 1*

#### A

As discussed above, Boeing claims there is no issue of material fact because it did not "design, manufacture, install, configure, select, purchase, sell or even come into contact" with the allegedly defective seats at issue in MSJ # 1. Doc # 56 at 1. To establish this absence of factual issues, Boeing offers the discovery responses of the airlines, which list the seat manufacturers who designed and installed the seats into the aircraft after it was sold to the airline by Boeing. Id at 3–4. Plaintiffs claim that a genuine issue of material fact exists regarding whether Boeing was involved in manufacturing, designing, installing or refurbishing the seats. Doc # 94 at 4. To support their claim, plaintiffs offer the following evidence: "The [a]ir-

lines' responses [to plaintiffs' discovery interrogatories] are replete with objections and qualifying language. Thus, their responses are not reliable * * *." Id. This does not suffice to raise a genuine issue of material fact.

First, the "objections and qualifying language" that plaintiffs assert make the airlines' responses unreliable are merely a standard litany of objections and qualifications that parties regularly include in interrogatory responses. For example, when asked by a plaintiff to identify "all entities involved in the design of the seats," American Airlines responded:

"American [Airlines] objects to this interrogatory on the ground that it is compound, vague and ambiguous * * * and overbroad. Without waiving its objections, American responds as follows: Upon information currently known to American, the 'entitites' * * * include itself, Recaro Aircraft Seating and/or Weber Aircraft. Doc # 59 (Koh Decl), Ex B at 2."

While these standard objections are unedifying, they do not undermine the reliability of the information these responses contain. Moreover, assuming arguendo that these "objections and qualifying language" have an effect on Boeing's proffered evidence, plaintiffs offer no evidence sufficient to raise a genuine issue of disputed fact that, divorced from objections and qualifications, the discovery responses would have been any different. The court is left only with plaintiffs' speculation that different discovery answers would have been given by the airlines. Speculation and conclusions, however, are insufficient to raise a genuine issue of material fact. *Thornhill Publishing Co.*, 594 F.2d at 738.

Next, plaintiffs' own behavior belies their assertion that the airlines' discovery responses are unreliable. For example, as discussed above, in *Wylie v American Airlines, Inc, et al*, 02–2997 VRW, defendant American Airlines responded to plaintiff's interrogatory by stating that Recaro Aircraft Seating and Weber Aircraft were involved in the design and manufacturing of the seats. Doc # 59, Ex B at 2. Seizing upon this new information, plaintiff, represented in that case by plaintiffs' counsel here, filed a motion to file a fifth amended complaint specifically to add Recaro and Weber as defendants. (02–2997 Doc # 96). In support of his motion, the *Wylie* plaintiff stated that "the [seat] manufacturers, WEBER AIRCRAFT LP and RECARO [ ] were recently identified by American * * * *and are proper parties to this lawsuit."* Doc # 98 at 2 (emphasis added). Accordingly, when it comes to *adding* potentially liable co-defendants, plaintiffs espouse the reliability of the airlines' discovery responses. But when these responses are offered by Boeing in support of its assertion that it was *not* the manufacturer or designer, the airlines' responses suddenly become "unreliable." The court will simply not countenance such crayfishing by counsel who are dangerously close to sanctionable conduct by such tactics.

Also, plaintiffs cannot rely on their Rule 56(f) application in asserting that further discovery would have allowed them to ascertain or identify evidence to support the unreliability of the airlines' declarations. *Nowhere* in their Rule 56(f) application do plaintiffs mention the unreliability of these discovery responses, nor do they state what specific facts they hope to elicit by either propounding the interrogatories on the airline defendants again or pursuing discovery from the manufacturers identified in the responses. Accordingly, further discovery is not appropriate on the issue of the reliability of the airlines' responses.

■ Finally, plaintiffs argue that even if the airlines' responses make it undisputed that Boeing did not manufacture, de-

sign or install the seats, these responses do not provide evidence that Boeing "replaced or refurbished" the seats in question after installation, and thus plaintiffs need discovery in order to oppose MSJ # 1. Doc # 94 at 4. Plaintiffs argument does not raise a triable issue or suggest that discovery may lead to evidence that would raise a triable issue. In plaintiffs' Rule 56(f) application, two pages contain an apparently exhaustive list of "[t]he [p]articular [f]acts [t]hat the [plaintiffs] [r]easonably [e]xpects to [o]btain in [d]iscovery." Doc # 89 at 4–5. Nowhere in this section do plaintiffs assert that they reasonably expect to obtain facts regarding any replacement or refurbishment of the seats by Boeing. Plaintiffs' speculations that Boeing, at some point unknown, covertly replaced or refurbished the seats are untethered to any reasonable expectation of obtaining such facts via further discovery and thus their Rule 56(f) application on this issue is simply inadequate.

Boeing has met its burden of establishing the absence of a genuine issue of material fact regarding whether it designed, manufactured, installed or replaced the allegedly defective seats at issue in MSJ # 1. *Celotex Corp.*, 477 U.S. at 322–23, 106 S.Ct. 2548. Plaintiffs have produced only speculation and bald conclusions in support of their claim that a genuine issue of material fact exists. Moreover, plaintiffs have failed to set forth specific facts they hope to elicit to oppose MSJ # 1. Accordingly, the court concludes as a matter of law that Boeing did not design, manufacture, install, replace or refurbish any of the allegedly defective seating at issue in MSJ # 1.

■ As there is *no genuine issue* of material fact concerning Boeing's contact with the seating, the only issue remaining is legal: Can a manufacturer be held liable for a defective product with which it never had contact? To state the question is almost to answer it, but the court will indulge plaintiffs' arguments.

Plaintiffs answer this question in the affirmative, drawing the court's attention to the "universal principles of products liability law," Doc # 94 at 7, set forth in the Restatement (Second) of Torts that:

> One who *sells* any product *in a defective condition* unreasonably dangerous to the user or consumer * * * is subject to liability for physical harm thereby caused to the ultimate user or consumer * * *. Restatement (Second) of Torts § 402A (American Law Institute, 1965) (emphasis added).

Section 402A applies to product liability based upon strict liability or negligence. Id. Citing section 402A, plaintiffs assert that "[t]he manufacturer of a product is responsible for the defects of the completed product." Doc # 94 at 7. Moreover, plaintiffs claim that Boeing, as manufacturer of the aircraft, is liable for the their DVT because Boeing is responsible for all defects in the completed product. Id. This argument fails because it is based upon a marred concept of the "completed product" in these cases. Plaintiffs assert that (1) Boeing is the manufacturer of the aircraft and (2) the completed product is the aircraft *after* the airlines have purchased and installed the seats. This is incorrect. While Boeing is the manufacturer of the aircraft, the completed product is the aircraft as delivered by Boeing to its customer, here sans seating.

The Restatement provision cited by plaintiffs is in accord with the court's interpretation of the "completed product." Section 402A imposes liability on a manufacturer that "sells any product *in a defective condition*." According to plaintiffs, the defective condition in the aircrafts is the seat design and seat configuration. Both of these conditions, however, were not present when Boeing sold the aircraft

to the individual airlines. Boeing sold a product free of any defective conditions and is thereby shielded from liability under the "universal" principles of product liability law. See 1 *American Law of Products Liability* § 5:1 (Lawyer's Co-Operative, 3d 1987) ("there must first be proof that the defendant manufactured, sold or was *in some way responsible for the [defective] product * * * "*) (emphasis added); see also *Brown v. Philip Morris, Inc.*, 228 F.Supp.2d 506, 515 (D.N.J.2002) ("A fundamental principle of products liability law is that a plaintiff must prove, as an essential element of his case, that the defendant manufacturer actually made the particular product which caused the injury.") (citation omitted).

Plaintiffs also cite *Vandermark v. Ford Motor Co.*, 61 Cal.2d 256, 37 Cal.Rptr. 896, 391 P.2d 168 (1964) as support for their position that Boeing is liable for the "completed product." Doc # 94 at 7. *Vandermark*, however, offers no support to plaintiffs. In *Vandermark*, Ford delivered a car to an authorized Ford dealer who was empowered to sell the car to customers after the dealer made "final inspections, corrections and adjustments necessary to make the car ready for use." *Id* at 261, 37 Cal.Rptr. 896, 391 P.2d 168. The car was sold by the authorized dealer with a defective master cylinder assembly, a defect which subsequently caused an accident. *Id.* Ford attempted to escape liability by arguing that the defect could have arisen *after* Ford delivered the car to the dealer. *Id.* The California Supreme Court rejected Ford's argument, stating that Ford "cannot escape liability on the ground that the defect in Vandermark's car may have been caused by something one if its *authorized dealers* did or failed to do." *Id.* (emphasis added). Because it was empowered by Ford to inspect, correct and adjust the automobiles prior to selling them to customers, the authorized dealer was, according to the California Supreme Court, an

agent of Ford and thus part of the Ford manufacturing process. Consequently, Ford could be held liable even if its authorized dealer had caused the cylinder defect.

*Vandermark*, which appears to be more about agency principles than about product liability law, is distinguishable from the facts in the present DVT cases. First, Boeing did not *deliver* the aircrafts to the airlines in order to allow the airlines to complete the Boeing manufacturing process. Boeing *sold* the aircraft to the airlines and the airlines were free to do, or not do, whatever they so desired with those purchased aircraft. Next, and more importantly, there is no evidence that either the airlines or the seat manufacturers selected by the airlines were authorized dealers or agents of Boeing; Boeing is not responsible for the actions or inactions of the seat manufacturers. The seat manufacturers did not act pursuant to Boeing specifications, instructions, directions or procedure; the seat manufacturers were not Boeing's authorized representative or agents.

Accordingly, Boeing did not design, manufacture, install or replace the allegedly defective seating in MSJ # 1. Boeing sold its "completed product" (an aircraft with no seats) to the airlines with no defective condition. In such a situation, Boeing cannot be liable (based upon either strict liability or negligence) under the tort laws of any state, as these principles are, as characterized by plaintiffs, "universal." Moreover, it appears plaintiffs' counsel agrees with this proposition. When he appeared before the Judicial Panel on Multidistrict Litigation on May 27, 2004, he was asked how a court could impose tort liability on a aircraft manufacturer who did not manufacturer the allegedly defective seats. Doc # 61, Ex Q at 3 (JPDL testimony). In response, plaintiffs' counsel

stated that he was not interested in pursuing such a theory of liability and that "if the plane manufacturer [Boeing] did not manufacture or install the seat, we have stipulated to summary judgment in those cases. * * * . We are interested in the manufacturers that *actually manufactured or installed the seat into the aircraft.*" Id (emphasis added).

At oral argument the court reminded plaintiffs' counsel of his representations to the MDL panel. Tr at 19:13–20:11. Plaintiffs' counsel acknowledged his representations, but informed the court that he had "picked up a trail that suggests that Boeing is very much involved" with aircraft seating "from possibly designing prototypes for the other manufacturers to copy, to suggesting what type of seats should go into the aircraft, to basically controlling the entire process." Tr at 19:2–6. When the court asked plaintiffs' counsel for any evidence to support his statements, he referred the court to Exhibit B in his December 23, 2004, declaration which appeared to be a handout from a Boeing supplier conference. Tr at 23:6–7. When asked, however, to point to "what it is [he] was relying upon [in Exhibit B] that establishes Boeing's role in the specification of seats that are installed in the aircraft," plaintiffs' counsel admitted that there is nothing in this exhibit that refers to Boeing's role in seating. Tr at 24:15–24. Again, plaintiffs' counsel touches the line. The court expresses its concern about counsel's conduct and warns that continued episodes of this character will go neither unnoticed nor without appropriate action by the court to protect the integrity of these proceedings and the public interest.

Next, plaintiffs' counsel directed the court's attention to Exhibit C of the same declaration which appeared to be a two-page article from an online magazine. Tr at 25:14–18. Plaintiffs' counsel pointed to two sentences explaining that Boeing had "recognized" a supplier called Koito Industries, Ltd, for "excellent product quality * * * in the supply of passenger seats." Doc # 90 (Danko Decl) Ex C at 2. Plaintiffs' counsel, based upon this single passage in a hearsay document, asks the court to grant plaintiffs' Rule 56(f) application and allow him to proceed with in-depth discovery regarding Boeing's significant, but apparently covert, role in controlling the entire aircraft seating market. Doc # 89 (56(f) App) at 4 (stating that plaintiffs reasonably expect to obtain discovery to show that "Boeing controls the economic success of seat suppliers" and that "Boeing controls the [entire] production of passenger seats").

For two reasons, the court will not allow plaintiffs to delay summary adjudication in order to pursue this discovery. First, as stated above, if the Rule 56(f) movant has failed diligently to pursue discovery in the past, the court is well within its discretion to deny the 56(f) application. *Nidds,* 113 F.3d at 920. The twelve cases in MSJ # 1 have been pending for well over a year and several have been pending for more than two years. While plaintiffs have diligently pursued discovery against the airline defendants named in these cases, no discovery was served on Boeing until Boeing filed MSJ # 1. Moreover, plaintiffs have known since October 13, 2004, that Boeing's motions for summary judgment would be heard on January 13, 2005, yet they did not serve discovery during the months of October or November. To explain this delay in pursuing discovery, plaintiffs state that they believed the court "stayed" all discovery in the DVT MDL, including discovery against Boeing, at the October 13, 2004, case management conference (CMC). Doc # 89 at 4. This argument is unpersuasive, for the transcript of the October 13, 2004, CMC, makes clear that discovery was only stayed as it related to the airline defendants, not Boeing or

Airbus SAS. Moreover, even if it was reasonable for plaintiffs to believe discovery against Boeing had been stayed, plaintiffs did not seek relief from the stay in order to serve discovery on Boeing prior to the January 13, 2005, hearing. And indeed, plaintiffs' counsel sought relief from the discovery stay order in *Parvathanini v. Indian Airlines,* 03–3842 VRW, to pursue jurisdictional discovery on defendant Indian Airlines, and thus oppose its FRCP 12(b)(1) motion. See 04–1606 VRW, Docs # 33, 34. Plaintiffs offer no explanation for why they did not do the same to oppose Boeing's motions.

Also, "denial of a Rule 56(f) application is proper where it is clear that the evidence sought is almost certainly nonexistent or is the object of pure speculation." *Terrell v. Brewer,* 935 F.2d 1015 (9th Cir. 1990) (citing *Volk v. D A Davidson & Co.,* 816 F.2d 1406, 1416–17 (9th Cir.1987)). Based solely upon two sentences contained in an on-line magazine article which states that Boeing works with a seat manufacturer called Koito, plaintiffs assert that Boeing controls the *entire* production of passenger seats. Such unsupported speculation does not suffice under Rule 56(f). Accordingly, plaintiffs' Rule 56(f) application is **DENIED.**

### B

Plaintiffs also assert four other theories upon which Boeing's liability may be based. Doc # 94 at 10–14. Plaintiffs allege that Boeing (1) defectively designed the seat tracking system on the aircraft, (2) breached its duty to warn the airlines of DVT, (3) breached its duty to warn passengers of DVT and (4) breached its duty, as a market participant, to exert pressure on the airlines and seat manufacturers. Doc # 94 at 10–14. All of these theories argue that, even if the completed product sold by Boeing was the aircraft with no seating, Boeing is *still* liable to plaintiffs for the DVT caused by the airlines' seat selection and installation. Id. All four theories, however, fail to persuade.

### 1

### *Defective Seat Tracking Theory*

■ Though Boeing delivers the aircraft to the airlines with no seats, the aircraft does contain a seat tracking system (STS). The STS is a system of tracks that are secured to the aircraft cabin floor and upon which the later installed seats are bolted. Boeing manufactures and installs the STS in a manner that can accommodate "a wide rage of seating configurations." Doc # 71 (Freeman Decl) at 4, ¶ 16. For example, "an airline can choose to configure a cabin with all [f]irst class seats, or can request that rows of seats be installed as far as five feet or more apart." Id. Accordingly, the airline is free to configure the seats in whatever manner it so chooses, depending, of course, upon seating configuration certification by the Federal Aviation Administration (FAA). Id. It is undisputed that the seating configurations on each aircraft in MSJ # 1 were certified by the FAA.

Plaintiffs seize upon Freeman's declaration and assert that the STS is defectively designed because it "permits [seating] configurations that are unsafe for passengers." Doc # 94 at 10. Boeing was under a duty, according to plaintiffs, to "design the track system to establish a minimum seat pitch, [and] thus ensure adequate passenger mobility." Id. In other words, plaintiffs assert that the STS contains a design defect because it does not *prohibit* all airlines from installing seats closely together. Plaintiffs, however, do not quantify what distance between seats constitutes "too close." Because Boeing admits that the STS does not prohibit airlines from placing seats closely together, there is no dispute of fact and the question for resolution is a question of law: Is

Boeing under a duty to prohibit airlines from placing seats "closely together?"

For several reasons, the answer is no. First, Boeing has no legal authority to require the airlines to configure the seats in a manner that maximizes passenger safety; that authority is vested in the FAA. Next, this duty to prohibit, upon reaching its logical end, would lead to untenable results, as a manufacturer would become liable for any purchaser's later use or misuse of the manufacturer's product. For example, Ford does not manufacturer its automobiles with a breathalyzer ignition to prohibit drivers from starting the vehicle if they are intoxicated. Under plaintiffs' "duty to prohibit" theory, however, Ford would have a duty to prohibit a drunk driver's misuse of the vehicle, and Ford would be liable for all damage forseeably caused by the drunk driver's accidents. Finally, plaintiffs cite no case law, and the court can find none, to support this novel "duty to prohibit." In fact, there is recent case law that cuts against imposing liability on manufacturers based upon a purchaser's use or misuse of a product. See *In re Firearm Cases,* 24 Cal.Rptr.3d 659, 2005 Cal App LEXIS 211 (Cal.App. 1 Dist.2005).

In *In re Firearm Cases,* plaintiffs brought suit against several handgun manufacturers under state unfair competition law and tort law based on a theory of public nuisance. *Id.* 24 Cal.Rptr.3d at 663, at *5. One theory of plaintiffs' case was that the gun manufacturers were obligated to prohibit gun retailers from selling the handguns to criminals (e g, handgun manufacturers should have conducted investigations to identify "high risk retail dealers who were associated with large quantities of guns that were traced by law enforcement authorities as having been used in crimes."). *Id.* 24 Cal.Rptr.3d 659 at 664, *9. As the California court stated: "Plaintiffs in this case seek to hold the gun

manufacturers * * * liable * * * for failing to take proactive steps to control the practices of the * * * firearms [retailers] that they ultimately supply." *Id.* 24 Cal. Rptr.3d at 666–67, *17. The court noted that plaintiffs had "not alleged a tort action for products liability that requires elements of breach of duty and legal causation." *Id.* 24 Cal.Rptr.3d at 668, *21 n12. The court hinted that plaintiffs' litigation strategy was wise because while it is clear "that the defendants in this case may have a duty to use ordinary care in the conduct of their business, [that] does *not create a duty to initiate an affirmative program of investigation and sanctioning of wayward retailers." Id.*

It is important to note that the court refused to impose this affirmative duty on manufacturers of *firearms,* an inherently dangerous instrumentality. If firearm manufacturers have no duty to investigate and sanction misusing purchasers, it must follow that airline seat tracking system manufacturers, a demonstrably far less dangerous product, are likewise absolved of such a proactive duty.

Manufacturers are not their purchasers' keeper. Tort law does not impose a duty continuously to look over the purchaser's shoulder to ensure he or she is not harming someone with the manufacturer's product. Accordingly, the court holds as a matter of law that the STS was not designed defectively, for Boeing was under no "duty to prohibit."

2

*Marketing Enterprise Theory*

Next, plaintiffs assert that Boeing is liable for their DVT condition because Boeing is "an integral part of the overall producing and marketing enterprise" of the commercial "airline economic market." Doc # 94. According to plaintiffs, the "overall marketing enterprise" of commer-

cial aircraft consists of aircraft manufacturers (e g, Boeing), airlines (e.g., Delta) and seat manufacturers, designers and suppliers (e.g., Weber Aircraft). Plaintiffs contend that because Boeing is a participant in the enterprise, it is in the unique position to (1) "advise" the airlines about the "risks of seat design and configuration" (an area, of course, that Boeing is not involved in) and (2) "exert pressure" on the airlines and seat manufacturers to design safer seats and seating configurations. Id. at 10, 12. Because Boeing did not exert this pressure, offer its advice and "reward" seat manufacturers and airlines that placed seats further apart, Boeing is liable, according to plaintiffs, for the airlines' and seat manufacturers' resulting tortious behavior. Boeing concedes that it did not fulfill any of the "duties" plaintiffs seem to require of it under this theory of liability. Accordingly, there is no factual issue and the remaining question is a question of law: Do these duties exist?

Again, plaintiffs offer the court no case law, and the court can find none, that supports this "duty to exert pressure" or "duty to reward" theory of liability. Moreover, carried to its logical end, this novel theory would produce extraordinary results. For example, Dell is clearly a integral part of the overall market for retail computers and is in a unique position to "exert pressure" on and "advise" software manufacturers such as Microsoft to produce only the highest quality computer software. If Dell does not offer such advice or exert such pressure, is it liable for all computer crashes caused by defective Microsoft software? Is Dell liable because it did not reward Microsoft for its nondefective software packages?

Under plaintiffs' market enterprise theory of liability, it matters not that the manufacturer had no contact with the allegedly defective product—so long as it is a market participant, has deep pockets and can recover the cost by increasing its prices. This theory—if it deserves the name—finds no legal support. The court holds, as a matter of law, that Boeing was under no duty to "exert pressure" or "reward."

### 3

### *Duty to Warn the Airlines*

■ Boeing, according to plaintiffs, had a duty to warn the airlines about: (1) the risk of DVT from unsafe seat design and seating configuration, (2) which seat manufacturers were building and designing these allegedly unsafe seats, (3) safer alternative designs of aircraft seating and the companies that made them (such as Newsit and Long Haul Technologies) and (4) the preventative measures that could be taken by passengers to reduce the risk of DVT. Doc # 94 at 10, 14.

In attempting to raise a genuine issue of material fact concerning whether Boeing *actually knew* any of this information listed above, plaintiffs state that "Boeing had knowledge of the risks of DVT and the industry's own recognition of the need to give DVT warnings to airline passengers" because Boeing was a member of the International Air Transportation Association (IATA). Doc # 94 at 14. To support this conclusion, plaintiffs offer a two-page press release issued by IATA to all of it members labeled "DEEP VEIN THROMBOSIS AND AIR TRAVEL." Doc # 90 (Danko Decl), Ex K. This document is inadmissible hearsay and therefore cannot suffice to raise a genuine issue of material fact. *Japan Telecom*, 287 F.3d at 875, n. 1. More importantly, the press release actually reads that "there is no conclusive medical evidence supporting the alleged connection of [DVT] with long distance travel."

Assuming arguendo that Boeing possessed the knowledge plaintiffs attribute to it regarding DVT, the question becomes a

legal question: Did Boeing have a duty to warn the airlines about DVT and defective seating conditions? The answer is no. First, plaintiffs cite no case law to support their assertion that a manufacturer has a duty to (1) warn a purchaser of potentially defective products that exist in the world and reasons why the purchaser should avoid these products and (2) specify products that the manufacturer subjectively believes are more safe. Moreover, the court can find no case law that supports the idea that a manufacturer, after selling a completed product to a purchaser, remains under a duty to warn the purchaser of potentially defective additional pieces of equipment that the purchaser may or may not use to complement the product bought from the manufacturer.

For example, if a customer buys a car from a manufacturer that does not manufacture or install bicycle roof racks, is the car manufacturer under a duty to (1) warn the customer of all potentially defective brands of roof racks and (2) suggest which brands of roof racks it believes are the safest? If the manufacturer doesn't "warn and suggest," is it liable for damage caused by a defective roof rack purchased by the customer? What if the manufacturer does "warn and suggest," and the customer disregards this advice, is the manufacturer shielded from liability? Or was the manufacturer required to follow-up to ensure the customer followed its advice? Plaintiffs offer no cases, treatises or answers to these questions. The court refuses to blaze a new trail unaided by some law or common sense, neither of which plaintiffs have provided.

Moreover, the court notes in passing that plaintiffs again want to have it both ways. For in their complaints, they assert that the airlines, as well as the "airline industry generally, had actual knowledge of the risk to passengers of contracting DVT during lengthy flights." See, e g,

*Wylie* (02–2997 VRW) (fourth amended complaint). In trying to impose liability on Boeing, however, plaintiffs characterize the airlines and the airline industry as uninformed and unsophisticated about the risk of DVT. The court holds, as a matter of law, that Boeing was under no duty to warn the airlines.

4

*Duty to Warn Passengers*

█ Finally, plaintiffs in MSJ # 1 assert that Boeing breached its duty to warn passengers. Boeing, according to plaintiffs, was under a duty to "include warnings in the cabin to advise the passengers of the risks of DVT or the simple steps that can be taken to reduce the risk of DVT." Doc # 94 at 14. Again, Boeing concedes that it did not place DVT warning signs in the cabins of its aircraft and thus the question for resolution is legal: Did Boeing have a duty to warn airline passengers of the risks of DVT and potential preventative measures? The answer is no.

Plaintiffs do not cite any case law for the proposition that a manufacturer, after its product is sold to a purchaser, is under a duty to warn a third party (with whom the manufacturer has never had contact) that the purchaser may or may not have supplemented the manufacturer's completed product with an allegedly defective piece of equipment. This convoluted theory of liability stretches a manufacturer's tort liability too far. Under plaintiffs' theory, Boeing would be a under a duty, after selling a completed aircraft to Delta, to inspect and discover (1) what seat manufacturer Delta chose and (2) whether the seats actually installed are somehow defective. If Boeing decides that Delta purchased potentially defective seats, Boeing would be under a duty to include warning placards in the aircraft's cabin—a cabin that is no longer Boeing's property—warning passengers

that Boeing believes the seats on the plane are defectively designed or configured in a way that increases DVT risks and that passengers should ambulate during the flight and stay well hydrated. Such a proactive duty is at odds with the astute reasoning of *In re Firearm Cases.* If *firearm* manufacturers do not have to take proactive steps to "investigate and sanction wayward purchasers," why would the manufacturer of an aircraft be under such a duty? There is no support for imposing such a duty on Boeing as aircraft manufacturer.

Accordingly, the court holds, as a matter of law, that Boeing was under no duty to warn airline passengers of the risks of DVT.

### 5

In sum, the court DENIES plaintiffs' Rule 56(f) application for further discovery in MSJ #1 and GRANTS MSJ #1 (Doc #56) in its entirety.

### IV

### MSJ #2

### A

■ There is one difference between the five cases in MSJ #2 and the twelve cases discussed in MSJ #1: In MSJ #2, Boeing concedes that it installed the allegedly defective seats at issue. Doc #63 at 8.

Boeing asserts, however, that the installation was simply a "service provided to the airlines." Id. Boeing states that it was not involved in designing, manufacturing, purchasing or selling the allegedly defective seats at issue on these five aircraft and again offers the airlines' responses to plaintiffs' interrogatories to support this claim. Doc #68, Exs B, D–G (airline responses) (identifying Weber Aircraft, B/E Aerospace, Recaro AS and FROG Designs as the manufacturers and designers of the seats in question). Additionally, Boeing

claims that it was not involved in the seating configuration process:

> [W]here Boeing is requested to install seats before delivery of the aircraft, the airline selects the manufacturer and model of seats, purchases the seats, and delivers them to Boeing for installation. *The airline also decides the seating configuration on its aircraft which is then subject to FAA certification.*

Doc #71 (Freeman Decl) at 4, ¶16 (emphasis added).

Moreover, in a motion to compel further responses from all airline defendants in the Warsaw cases, plaintiffs themselves state that "when purchasing aircraft, [d]efendant [a]irlines specify the *location of the seats and select the model of seats.*" Doc #62, Ex AA at 15 (emphasis added).

Plaintiffs now assert, however, that a genuine issue of material fact exists whether Boeing was involved in the design, manufacture or configuration of the allegedly defective seats. Doc #95 at 4–5. In support of this argument, plaintiffs do not question the reliability of Daniel Freeman's declaration nor do they address the statement contained in the motion to compel further responses. Instead, as they did in MSJ #1, plaintiffs attempt to create a factual dispute by calling into question the reliability of the airlines' interrogatory responses. Id at 4. For the same reasons explained in MSJ #1, this argument fails to raise a genuine dispute of material fact. See *supra* Part III(A).

Accordingly, it is undisputed that Boeing did not design, manufacture, sell or purchase the allegedly defective seats at issue in MSJ #2. Moreover, Boeing was not involved in designing the seating configuration; it simply installed the seats pursuant to the configuration determined by the airline and certified by the FAA. As there are no issues of fact, the question for resolution is a legal one: As the installer

of allegedly defective seats, what is the scope of Boeing's liability under state tort law?

Boeing provided the court with case law and statutes from each of the jurisdictions in which plaintiffs reside that support Boeing's assertion that it cannot be held liable under state tort law solely on the basis of installation. See Doc # 63 at 8–15 (case law). In New Jersey, if a manufacturer is identified, the product seller must be dismissed absent a showing of negligence. NJ Stat Ann § 2A:58C–9(b). "Product sellers" include installers. NJ Stat Ann § 2A:58C–8 (03–5144 VRW—New Jersey).

In Virginia, parties can only be held liable for their own negligence, as Virginia does not recognize strict liability. *Sensenbrenner v. Rust*, 236 Va. 419, 424, n. 4 (1988); *Buettner v. Super Laundry Machinery*, 857 F.Supp. 471, 473 (E.D.Va. 1994) (04–0875 VRW—Virginia).

In Illinois, there is no strict liability where defendant merely installed a product supplied by another. *Hinojasa v. Automatic Elevator Co.*, 92 Ill.App.3d 351, 354, 48 Ill.Dec. 150, 416 N.E.2d 45 (1980). A plaintiff may make, however, a claim of negligent installation if the plaintiff presents evidence for such a claim. *Sanchez v. Firestone Tire & Rubber Co*, 237 Ill.App. 872, 874, 178 Ill.Dec. 425, 604 N.E.2d 948 (1992).

Georgia allows for strict liability claims only against the manufacturer of a product. See Ga Code Ann § 51–1–11.1(b). By statutory definition, installers are not, "manufacturers." See Ga Code Ann § 51–1–11.1. However, a plaintiff may state a claim for negligent installation. *Williams v. City Ice Co.*, 190 Ga.App. 744, 744–45, 380 S.E.2d 341 (1989) (03–3760 VRW—Georgia).

Similarly, in the United Kingdom, only the producer of a product may be held liable under the Consumer Protection Act and for negligence. Doc # 64 (George Decl). Installers, however, are not "producers." Id.

Moreover, this legal question is not novel to the DVT litigation and the outcome has always been the same. First, in *James v. Delta Airlines*, CV 3–2088 (CD Cal), plaintiff developed DVT during a flight. It was later revealed that Boeing had installed the allegedly defective seats prior to delivering the aircraft to Delta. Subsequently, plaintiff sued Boeing for product liability and negligence based upon Boeing's role as installer of the seats. Boeing brought a motion for summary judgment claiming it was not liable because it was merely a "service provider" acting under the direction of the airline defendant. Rather than oppose this motion, plaintiff (who was represented by plaintiffs' counsel in these five cases) stipulated to dismissal of the claims against Boeing. See Doc # 69 (Koh Decl), Ex O at 2 (Dismiss Stip). In this stipulation, plaintiff conceded that Boeing was involved in installing the seats at issue. Id. at 2 ("Plaintiffs recognize that * * * Boeing was involved in the installation of some of the aircraft passenger seats"). Plaintiff agreed to dismiss the claim so long as plaintiff could reassert his claim against Boeing in the event "that discovery reveals within the next 12 months that Boeing designed, manufactured, maintained, repaired or decided the configuration" of the seats, rather than the airline themselves. Id. Accordingly, *James* acknowledged that Boeing, as seat installer, could not be held liable for products liability or negligence unless it could be shown that Boeing designed or decided the configuration of the seats: *installation is simply not enough.* Judge Walter approved this stipulation on January 16, 2004. Id.

In *Plotkin v. British Airways*, 03–3242 VRW, plaintiff, (again represented by plaintiffs' counsel in these five cases), en-

tered into a similar stipulation, *in this court*, dismissing Boeing unless it could be shown that Boeing was involved in designing or configuring the allegedly defective seats. See Doc # 69, Ex P at 2.

Finally, in *Shumaker v. UAL Corp*, 03–2997 (CD Cal 2004), Judge Walter actually granted summary judgment for Boeing on a claim where plaintiff (who was represented by plaintiffs' counsel in these five cases), had not offered any evidence that Boeing *"designed * * * or was any other way involved in the seating configuration."* Doc # 69, Ex L at at 3. Plaintiff did not appeal this judgment to the Ninth Circuit.

Plaintiffs' opposition to MSJ # 2 does not mention, much less distinguish *James, Plotkin* and *Shumaker*.

Accordingly, it is clear to the court that Boeing cannot be held liable in these five cases simply for installing the allegedly defective seats pursuant to the direction of the airlines. It must be shown that Boeing was involved in either designing and manufacturing the seats or configuring the seats on the aircraft. As discussed above, plaintiffs have failed to raise a genuine issue of material fact whether Boeing did either, and thus Boeing cannot be held liable for the allegedly defective seats or seating configuration as a matter of law.

Finally, in MSJ # 2, plaintiffs' assert that Boeing breached the same four "duties" discussed above in MSJ # 1. See *supra* Part III(B)(1)-(4). Those claims are rejected for the same reasons enumerated in MSJ # 1.

Accordingly, the court GRANTS MSJ # 2 in its entirety.

### V

In sum, the court DENIES plaintiffs' Rule 56(f) application (Doc # 89) and GRANTS MSJ # 1 (Doc # 56) and MSJ # 2 (Doc # 63) in their entirety. The clerk is directed to ENTER JUDGMENT in favor of Boeing in all seventeen of these cases. This order does *not affect* plaintiffs' claims against the airline defendants in these seventeen cases.

**IT IS SO ORDERED.**