[No. D023283. Fourth Dist., Div. One. Feb. 20, 1998.]

EDA ARTIGLIO et al., Plaintiffs and Appellants, v.
GENERAL ELECTRIC COMPANY, Defendant and Respondent.

## COUNSEL

Lopez & Hodes, Ramon R. Lopez and Beau James Nokes for Plaintiffs and Appellants.

Landels, Ripley & Diamond, James A. Bruen, Deborah K. Miller, Williams & Connolly and Carolyn H. Williams for Defendant and Respondent.

## OPINION

**BENKE, Acting P. J.**—In this case the supplier of silicone used in manufacturing breast implants contends that it cannot be held liable in negligence for failing to disclose to its customers information about the potential dangers posed by use of silicone in medical devices. The supplier, defendant and respondent General Electric Company (GE), argues that because it supplied silicone materials which are used in a number of other products, because the silicone materials it provided were subject to further processing by the actual manufacturers of breast implants and because the implant manufacturers themselves had the ability to determine the suitability and safety of the implants, it owed no duty of care to the eventual recipients of the silicone breast implants. The trial court agreed with GE and granted its motions for summary judgment. We affirm.

### FACTUAL AND PROCEDURAL BACKGROUND

Plaintiffs on this appeal are women who received silicone breast implants manufactured by McGhan Medical Corporation (McGhan). GE was the manufacturer of silicone products and it supplied McGhan with the silicone compounds the manufacturer used in producing their breast implants.

In particular, GE supplied McGhan 55-gallon drums of its CRTV6195A and 5-gallon pails of its CRTV6195B. When cooked together by an implant manufacturer, one drum of CRTV6195A and one pail of CRTV6195B produced enough gel to fill eight hundred eighty individual breast implants. GE also supplied McGhan with 55-gallon drums of its RTV7100A and 5-gallon pails of its RTV7100B; when cooked together these products were used by the implant manufacturers to produce silicone shells.

According to GE, implant manufacturers came to it with particular specifications as to the physical properties they wanted in the silicone they were purchasing and GE then produced products which met the manufacturers' specifications.

When it shipped the silicone material to an implant manufacturer, GE only warranted the material met the manufacturer's specifications. GE's shipping documents disclaimed any responsibility for determining whether the material was suitable for medical applications. In pertinent part, the shipping documents for every batch of material the implant manufacturers received stated: " 'Each user of the material should make his own tests to determine the material's suitability for his own particular use.' "

In formulating the materials it supplied to McGhan, GE used a basic chemical building block known as polydimethylsiloxane (PDMS). GE used PDMS in formulating a host of silicone materials for use by the manufacturers of everything from bed pads to electronic circuit boards to food additives to other medical devices.

In the trial court plaintiffs alleged GE was liable to them on theories of negligence, breach of warranty and deceit. Briefly, plaintiffs contend that at the time GE was supplying silicone materials to implant manufacturers, GE knew or should have known that silicone was not an appropriate material for use in medical devices and GE failed to convey what it knew or should have known to its customers. As we indicated at the outset, for its part, GE contends and the trial court agreed, that in light of its role as the bulk supplier of a raw material and its express disclaimers with respect to the suitability of silicone in medical applications, it owed the recipients of breast implants no duty of care.

Plaintiffs filed a timely notice of appeal from the judgment dismissing GE as a defendant in their respective cases.

## DISCUSSION

### I

### *Standard of Review*

■ As we recently noted: "Summary judgment is proper only where there is no triable issue of material fact and the moving party is entitled to judgment as a matter of law. [Citation.] 'To secure summary judgment, a moving defendant may prove an affirmative defense, disprove at least one essential element of the plaintiff's cause of action [citations] or show that an element of the cause of action cannot be established [citations].' [Citation.] 'All doubts as to whether any material, triable issues of fact exist are to be resolved in favor of the party opposing summary judgment. [Citation.]' [Citation.] We review the record de novo to determine whether defendants met their burdens of proof. [Citation.]" (*Fieldstone Co.* v. *Briggs Plumbing Products, Inc.* (1997) 54 Cal.App.4th 357, 363 [62 Cal.Rptr.2d 701].)

### II

### *Negligent Failure to Warn*

■ In California ". . . the manufacturer has a duty to use reasonable care to give warning of the dangerous condition of the product or of facts which make it likely to be dangerous to those whom he should expect to use the product or be endangered by its probable use, if the manufacturer has reason to believe that they will not realize its dangerous condition." (*Putensen* v. *Clay Adams, Inc.* (1970) 12 Cal.App.3d 1062, 1076-1077 [91 Cal.Rptr. 319] (*Putensen*); see also Rest.2d Torts, §§ 388, 394.) Thus "[n]egligence law in a failure-to-warn case requires a plaintiff to prove that a manufacturer or distributor did not warn of a particular risk for reasons which fell below the acceptable standard of care, i.e., what a reasonably prudent manufacturer would have known and warned about." (*Anderson* v. *Owens-Corning Fiberglass Corp.* (1991) 53 Cal.3d 987, 1002 [281 Cal.Rptr. 528, 810 P.2d 549].)

In *Putensen* the defendant was the manufacturer of plastic tubing which it supplied to hospitals in 100-foot rolls. The tubing was stretched and soaked by a heart surgeon and fashioned into a heart catheter. When the catheter was placed in the plaintiff's aorta, it kinked and could not be withdrawn safely from her blood vessel; instead, the catheter had to be removed surgically. Although the tube manufacturer conceded it was aware its tubing was being used by doctors to fashion heart catheters, it did not suggest such use to its hospital customers and in fact had a policy "that the use to which

the tubing was put was a matter to be determined by the user." (*Putensen, supra*, 12 Cal.App.3d at p. 1071.)

The plaintiff in *Putensen* sued the tubing manufacturer and alleged, among other theories, the manufacturer was negligent in failing to warn its customers the tubing was subject to kinking. In support of her theory, the plaintiff produced testimony from an engineer who found the tubing was subject to kinking especially if it had been heated or soaked. In finding the plaintiff had produced enough evidence to withstand a nonsuit on her negligence cause of action against the tube manufacturer, the court in *Putensen* stated: "[A]t the very least, it was a question for the jury whether a reasonable test or inspection would have disclosed that the subject tubing had a propensity to 'kink.' If it found that such a reasonable inspection would have disclosed this propensity, the jury could decide that [the manufacturer] violated its duty to produce a product reasonably safe for its intended use either on the basis that it could have corrected this deficiency but failed to do so, or, on the basis that if the deficiency was not susceptible of correction, [the manufacturer] failed to warn of the dangerous propensity.

"We here point out that the fact that [the plaintiff's surgeon] may have been under a duty to plaintiff to make inspection of the tubing would not relieve [the manufacturer] from liability for negligence arising from its duty as a manufacturer. [Citations.] We also point out that whether [the plaintiff's surgeon] was using the tubing for the purpose intended was likewise a question for the jury as was the question whether the changes effected by him in the condition of tubing was a proximate cause of the injury to plaintiff rather than any breach of duty on the part of [the manufacturer.] [Citation.]" (*Putensen, supra*, 12 Cal.App.3d at pp. 1078-1079.)

The duty of a manufacturer to warn about the potential hazards of its product, even when that product is only a component of an item manufactured or assembled by a third party, has been recognized in other contexts as well. In *Groll v. Shell Oil Co.* (1983) 148 Cal.App.3d 444 [196 Cal.Rptr. 52], the issue was the potential liability of the supplier of flammable lantern fuel, purchased in bulk and repackaged by an intermediate supplier. The Court of Appeal found no liability on the part of the fuel supplier but only because it had provided adequate warning of the flammability of the product to the intermediate supplier. In doing so the court expressly recognized that the lack of such a warning could result in liability even though the fuel supplier was not responsible for the form of the ultimate package sold to the consumer: "[The supplier's] responsibility must be absolved at such time as it provides adequate warnings to the distributor who subsequently packages, labels and markets the product." (*Id.* at p. 449.) In *Stuckey* v. *Northern*

*Propane Gas Co.* (11th Cir. 1989) 874 F.2d 1563, 1568, the court, relying on knowledge of the ultimate consumer's use, found that a propane gas supplier had a duty to warn that the odorant in its gas was subject to fading. Similarly, in *Andrulonis* v. *U.S.* (2d Cir. 1991) 924 F.2d 1210, the court held the government liable to a vaccine researcher who contracted rabies after being exposed to a sample of the virus which was supplied by the government. The researcher's employer, with the government's knowledge, put the sample virus into aerosol form. The court held the government should have known about the grave risk of contracting the virus from the air and warned the researcher's employer about the extreme hazard the employer created when it put the virus into the aerosol form. (*Andrulonis* v. *U.S., supra,* 924 F.2d at p. 1223.)

However, the duty of a component manufacturer or supplier to warn about the hazards of its products is not unlimited. As one court stated: "Making suppliers of inherently safe raw materials and component parts pay for the mistakes of the finished product manufacturer would not only be unfair, but it also would impose and intolerable burden on the business world . . . . Suppliers of versatile materials like chains, valves, sand gravel, etc., cannot be expected to become experts in the infinite number of finished products that might conceivably incorporate their multi-use raw materials or components." (*In re TMJ Implants Products Liability Litigation* (8th Cir. 1996) 97 F.3d 1050, 1057.) Thus, cases have subjected claims made against component suppliers to two related doctrines, the "raw material supplier defense" and "the bulk sales/sophisticated purchaser rule." Although the doctrines are distinct, their application oftentimes overlaps and together they present factors which should be carefully considered in evaluating the liability of component suppliers. Those factors include whether the raw materials or components are inherently dangerous, whether the materials are significantly altered before integration into an end product, whether the supplier was involved in designing the end-product and whether the manufacturer of the end product was in a position to discover and disclose hazards.

A leading case which represents these doctrines is *Walker* v. *Stauffer Chemical Corp.* (1971) 19 Cal.App.3d 669 [96 Cal.Rptr. 803] (*Walker*). In *Walker* the plaintiff was injured when a drain cleaner, composed of 50 percent sulfuric acid and 50 percent alkaline base, exploded. Among others, the plaintiff sued the supplier of the sulfuric acid. The court held that, in light of the substantial changes made to the sulfuric acid by the maker of the drain cleaner, the sulfuric acid supplier owed no duty to protect the plaintiff. In doing so, the court relied on the reasoning of the Restatement with respect to strict liability: " 'In the absence of decisions providing a clue to the rules which are likely to develop, the Institute has refrained from taking any

position as to the possible liability of the seller where the product is expected to, and does, undergo further processing or other substantial change after it leaves his hands and before it reaches those of the ultimate user or consumer.

" ' . . . The question is essentially one of whether the responsibility for discovery and prevention of the dangerous defect is shifted to the intermediate party who is to make the changes. No doubt there will be some situations, and some defects, as to which the responsibility will be shifted, and others in which it will not.' " (*Walker, supra*, 19 Cal.App.3d at p. 673, quoting of Rest.2d Torts, § 402A, com. p, at p. 357.) The court in *Walker* went on to state: "We do not believe it realistically feasible or necessary to the protection of the public to require the manufacturer and supplier of a standard chemical ingredient such as bulk sulfuric acid, not having control over the subsequent compounding, packaging or marketing of an item eventually causing injury to the ultimate consumer, to bear the responsibility for that injury. The manufacturer (seller) of the product causing the injury is so situated as to afford the necessary protection. [Citation.]" (19 Cal.App.3d at p. 674.)

Consistent with *Walker*, the Restatement Second commentators noted: "It seems reasonably clear that the mere fact that the product is to undergo processing, or other substantial change, will not in all cases relieve the seller of liability under the rule stated in this Section. If, for example, raw coffee beans are sold to a buyer who roasts and packs them for sale to the ultimate consumer, it cannot be supposed that the seller will be relieved of all liability when the raw beans are contaminated with arsenic, or some other poison. . . . On the other hand, the manufacturer of pigiron, which is capable of a wide variety of uses, is not so likely to be held to strict liability when it turns out to be unsuitable for the child's tricycle into which it is finally made by a remote buyer." (Rest.2d Torts, § 402A, com. p, at p. 357.)

■ More recently, a series of cases involving the supplier of Teflon used in manufacturing temporomandibular jaw (TMJ) implants, have amplified the raw material and bulk supplier/sophisticated purchaser doctrines. (See *In re TMJ Implants Products Liability Litigation, supra*, 97 F.3d at pp. 1055-1058; *Kealoha* v. *E.I. Du Pont de Nemours and Co., Inc.* (9th Cir. 1996) 82 F.3d 894, 899-901; *La Montagne* v. *E.I. Du Pont de Nemours & Co., Inc.* (2d Cir. 1994) 41 F.3d 846, 857; *Apperson* v. *E.I. du Pont de Nemours & Co.*, (7th Cir. 1994) 41 F.3d 1103, 1107; *Klem* v. *E.I. Du Pont de Nemours Co.* (5th Cir. 1994) 19 F.3d 997, 1003.) The TMJ cases are significant because they have made it clear that knowledge of how a raw material will be used does not, by itself, create a duty to investigate the risks posed by the final product. "[T]he alleged forseeability of the risk of the finished product is

irrelevant to determining the liability of the component part manufacturer because imposing such a duty would force the supplier to retain an expert in every finished product manufacturer's line of business and second-guess the finished product manufacturer whenever any of its employees received any information about any potential problems." (*Kealoha* v. *E.I. Du Pont de Nemours & Co.* (D.Hawaii 1994) 844 F.Supp. 590, 594.)

The raw material and bulk supplier defenses have also been addressed by the drafters of the Restatement Third. The Proposed Final Draft of the Restatement Third of Torts: Products Liability, section 5, approved on May 20, 1997, by the American Law Institute, contains the following comments about the "raw material" and "sophisticated buyer" doctrines:

"Inappropriate decisions regarding the use of [raw] materials are not attributable to the supplier of the raw materials but rather to the fabricator that puts them to improper use. The manufacturer of the integrated product has a significant comparative advantage regarding selection of materials to be used. Accordingly, raw materials sellers are not subject to liability for harm caused by defective design of the end-product. . . . To impose a duty to warn would require the seller to develop expertise regarding a multitude of different end-products and to investigate the actual use of raw materials by manufacturers over whom the supplier has no control. Courts uniformly refuse to impose such an onerous duty to warn." (Rest.3d Torts (Proposed Final Draft) § 5, com. c, at p. 156.)

"[W]hen a sophisticated buyer integrates a component into another product, the component seller owes no duty to warn either the immediate buyer or ultimate consumers of dangers arising because the component is unsuited for the special purpose to which the buyer puts it. To impose a duty to warn in such a circumstance would require that component sellers monitor the development of products and systems into which their components are to be integrated." (Rest.3d Torts (Posposed Final Draft) § 5, com. b, at p. 154.)

Taken together, these authorities establish that component and raw material suppliers are not liable to ultimate consumers when the goods or material they supply are not inherently dangerous, they sell goods or material in bulk to a sophisticated buyer, the material is substantially changed during the manufacturing process and the supplier has a limited role in developing and designing the end product. When these factors exist, the social cost of imposing a duty to the ultimate consumers far exceeds any additional protection provided to consumers. (See *In re TMJ Implants Products Liability Litigation*, *supra*, 97 F.3d at p. 1057.)

■ Consideration of the factors relevant in applying the bulk supplier and sophisticated buyer defenses relieve GE of liability for negligence as a matter of law.

First and perhaps most importantly, there can be no real dispute the silicone supplied in bulk by GE was not inherently dangerous. GE supplied silicone to a number of other manufacturers which safely incorporated it into a host of other nonmedical products. The silicone only became potentially dangerous when used in medical devices.

Second, there is little doubt the implant manufacturers were highly sophisticated buyers. They were under a legal duty to investigate the potential hazards of implants and each one was in a position to test and evaluate the potential risks of its products and each of their components. In this regard, the purchasers from GE were in a far better position than the doctors in *Putensen* who fashioned individual heart catheters from tubing supplied by the defendant in that case.

With respect to the relative ability of GE and the implant manufacturers to discover and disclose particular risks of implants, we note that GE, by way of the express disclaimers it provided with its products, fully alerted the manufacturers of their responsibility for determining the suitability of silicone as the principle ingredient of the devices they were manufacturing. Although GE may have been privy to some environmental and biological hazards posed by exposure to airborne silicone particles and silicone fluids injected into laboratory animals, there is nothing in the record which suggests these risks, which were not directly related to use of silicone as a medical device, would have altered the manner in which implant manufacturers used the silicone supplied by GE.

Third, it is undeniable the materials supplied by GE were subject to substantial processing by the implant manufacturers. Notwithstanding the fact the silicone was supplied in the form of kits with instructions from GE, the implant manufacturers were responsible for "cooking" the silicone into silicone gel and silicone shells, injecting the gel into shells and packaging the implants. These substantial manufacturing and marketing processes, over which GE had no control, would plainly diminish the utility of any warning GE might attempt to provide ultimate consumers or any investigation GE might attempt with respect to the hazards of the final product. We also note the manufacturing and marketing steps in this record are substantially greater than the simple stretching which the doctor in *Putensen* performed in creating the heart catheters discussed in that case and make it far more reasonable to shift sole responsibility in this case from the component supplier to the manufacturer of the end product.

Finally, we turn to the question of how deeply GE was involved in designing and developing the implants manufactured by its customers. On

this issue, comment e to section 5 of the Restatement Third is instructive: "A component seller who simply designs a component to its buyer's specifications, and does not substantially participate in the integration of the component into the design of the product, is not liable within the meaning of Subsection (b). [Nor does providing mechanical or technical services or advice in the selection or integration of the component into a product over whose overall design, testing, or labelling the component supplier does not exercise control constitute substantial participation which would subject the component supplier to liability.]" (Rest.3d Torts (Proposed Final Draft) § 5, com. e, at p. 158.) Here the record is clear that while GE developed silicone to meet the specifications of manufacturers and consulted on a fairly regular basis about those specifications and problems the manufacturers were having, it in no way exercised any control over the design, testing or labeling of the implants.

In sum then, GE has shown that it would not be appropriate to impose on it a duty to plaintiffs because given its role in the manufacturing process, the social cost of fulfilling such a duty would far exceed the utility of imposing the duty. Accordingly, the trial court properly dismissed plaintiffs' negligence claims.

### III

On appeal plaintiffs argue that any representation GE made about the biocompatibility or suitability of GE's products for use in medical devices supports their breach of warranty and deceit claims. The difficulty we have in accepting this argument is GE demonstrated that it made no such representation.

In its statement of undisputed facts, GE cited specific testimony from McGhan employees to the effect that GE had made no representations regarding the biocompatibility or suitability of the materials it supplied to McGhan. Plaintiffs made only a half-hearted attempt to dispute the evidence GE relied upon.

Rather than identifying any particular declaration, document, or deposition transcript which contradicted GE's evidence, plaintiffs' separate statement of disputed facts merely stated: "See evidence previously produced in opposition to GE's earlier motions for summary judgment." In the memorandum of points and authorities they filed in the trial court, plaintiffs did not mention their deceit or warranty claims, let alone provide any greater clue about what evidence they believe contradicted the evidence presented by GE.

On this record the trial court was fully warranted in concluding GE's evidence was not disputed. (See *North Coast Business Park* v. *Nielsen Construction Co.* (1993) 17 Cal.App.4th 22, 30-31 [21 Cal.Rptr.2d 104] (*North Coast Business Park*); *United Community Church* v. *Garcin* (1991) 231 Cal.App.3d 327, 335 [282 Cal.Rptr. 368].) As this court stated in *North Coast Business Park*: "That the fact *could have been found* in the filed documents is of no value, because this would have imposed on the trial court the impossible burden of determining both the existence and significance of facts unmentioned by the parties. We will not place on the trial court the burden of conducting a search for facts which counsel failed to bring out, nor can we attribute a level of prescience to the trial court which counsel lacked. Instead, we adhere to the familiar rule that '*possible theories not fully developed or factually presented to the trial court cannot create a "triable issue" on appeal.*' " [Citation.] (17 Cal.App.4th at p. 31, fn. omitted.)

Application of the principles we discussed in *North Coast Business Park* are particularly pertinent here. Unlike the plaintiff in *North Coast Business Park,* these plaintiffs did not rely upon any documents they presented in opposition to GE's motion, but instead relied upon documents filed by other parties in response to previous motions. Thus, the burden they would have imposed on the trial court was somewhat greater than the burden we rejected in *North Coast Business Park*: Here, the trial court would not simply have to search documents presented in opposition to the motion, but would have to uncover and evaluate the significance of unidentified documents presented by other parties in response to other motions. Nothing in the summary judgment statute requires a trial court to become such an advocate for parties resisting summary disposition of their claims.

Because the record entirely supports GE's contention that it made no representations about the biocompatibility of its products or their suitability in medical applications, GE was also entitled to summary judgment on plaintiffs' warranty and deceit claim.

## IV

■ Finally, plaintiffs argue the trial court should have continued the motion for summary judgment. They argue that because their claims were part of a coordinated proceeding, they were not given an adequate opportunity to conduct discovery. They point out that following the trial court's order, a silicone chemist from GE testified that GE developed silicone which was specifically designed to meet the requirements of breast implant manufacturers.

We reject this argument for two reasons. First, plaintiffs did not ask the trial court for a continuance and their failure to give the trial court an

opportunity to consider their requests prevents us from doing so on appeal. (See *Steele* v. *Totah* (1986) 180 Cal.App.3d 545, 551-552 [225 Cal.Rptr. 635].) Second, evidence that a component supplier produced goods which met the specifications of a product manufacturer will not, by itself, support imposition of a duty on the component supplier. (See Rest.3d Torts (Proposed Final Draft) § 5, com. e, at pp. 157-158.)

Huffman, J., and Haller, J., concurred.