[EDITORS' NOTE: THIS OPINION IS DEPUBLISHED UPON GRANTING OF PETITION FOR REVIEW. THE OPINION APPEARS BELOW WITH A GRAY BACKGROUND.]
[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 1021 
[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 1022 
OPINION
Patrick J. O'Neil died of mesothelioma. His widow, appellant Barbara J. O'Neil (individually and as successor in interest to Patrick O'Neil), and his children, appellants Michael O'Neil and Regan Schneider, sued respondents Crane Co. and Warren Pumps LLC for negligence, negligent failure to warn, strict liability for failure to warn, and strict liability for design defect on the consumer expectation theory. After 15 days of jury trial, the court granted respondents' motion for nonsuit and judgment was entered in their favor. We reverse.
 Facts[1]
Patrick O'Neil died of mesothelioma in 2005, when he was 62 years old. The jury heard evidence connecting his disease to his exposure to asbestos during the period between June of 1965 and August of 1966, when he served as an officer on the USS Oriskany, an Essex class aircraft carrier built between 1944 or 1945 and 1950.[2] *Page 1023 
On the Oriskany, O'Neil was first a main engine junior officer, then a boiler division officer. In both assignments, he stood watch in the machinery spaces, that is, in the boiler rooms and engine rooms and machine room, where he was responsible for supervising repairs and maintenance of equipment in those rooms. He also supervised repairs when the Oriskany was in dry dock for a period of about three months, after a fire.
Through testimony from an expert witness, retired Navy Captain William Lowell, from former Crane and Warren employees, and from other witnesses, appellants produced evidence about the Oriskany and about respondents' products:
The main power source on the Oriskany was steam, produced by eight boilers in four rooms. The steam system operated at very high temperatures, and all valves, flanges, and fittings were necessarily covered in insulation. When the Oriskany was built, the primary type of insulation for that purpose was made of 18 percent magnesium and 15 percent asbestos. Asbestos was also used in the packing which was found in pumps and valves.
There were thousands of valves on the Oriskany. Most of the valves in the machinery spaces were made by Crane. All of the Crane valves contained asbestos-containing packing, and Crane itself specified that material. Most of the valves had asbestos-containing insulation. The valves had flange connections, and most of the flange connections required the use of asbestos gaskets.[3]
There were several hundred pumps on the Oriskany. Fifty-two of them were made by Warren Pumps, including reciprocating steam engine pumps and 6-foot-tall bilge pumps. All but four or five of the 52 pumps were located in the machinery spaces. The pumps had asbestos-containing insulation and asbestos-containing packing and were designed to be used with asbestos-containing gasket insulation. At least in some instances, asbestos-containing packing and insulation were supplied by Warren and were on the pumps when they were delivered. Warren knew that work on the pumps would require removal of asbestos gaskets. *Page 1024 
Packing and insulation had to be replaced or removed during the ordinary course of maintenance. The heat involved in steam power meant that the packing and insulation would bake onto the equipment, and could only be removed by being scraped off with a chisel or knife or wire brush. This work created asbestos dust.[4]
Douglas Deetjen, a shipmate of Patrick O'Neil's, worked in the Oriskany's boiler and engine rooms. He described the process of repacking valves and pumps, and of removing insulation from the equipment in the course of repair or maintenance. This would be done with a knife, scraper, grinder or wire brush, and produced a lot of dust. Deetjen saw O'Neil in the machinery spaces while this work was going on and dust was created. He testified that during these repairs, the dust floated all over the room, so that there was no way to avoid breathing the dust.
Lowell testified similarly, and also testified about dust-producing work undertaken by ship personnel during the repair of the Oriskany.
Deetjen testified specifically that work on Crane valves created dust and that Patrick O'Neil was in the room when that happened. He testified that work on Warren pumps created dust, and that he saw Patrick O'Neil in the room when work was being done on Warren pumps.
The Navy required manufacturers of equipment such as pumps and valves to provide manuals containing information about installation, operation, and maintenance. Manufacturers were required to include information about expected repairs and about safety cautions and requirements. Manuals also identified replacement parts. These manuals were living documents which could be changed during subsequent years.
None of the respondents' manuals included a warning about asbestos dust, or any recommendation concerning use of respirators or dust-reduction methods such as wetting friable asbestos. In the 1980's, Warren questioned Navy specifications on asbestos packing, raising issues about the health hazards. A Warren representative testified that nothing prevented it from doing so sooner, or from including warnings in the manuals.
Deetjen testified that his orders included an order to look at the manuals supplied by manufacturers. *Page 1025 
The jury also heard evidence on the Navy's design and procurement process. Appellants' expert witness testified that a shipbuilder, building a ship for the Navy, would turn to qualified manufacturers and direct them to the "broad specifications" the Navy provided. (For instance, the Navy might specify that pumps should deliver 600 gallons a minute, be turbine driven, and able to operate at temperatures of up to 600 degrees.) The manufacturer would take that information and design the pumps. Lowell testified that "the Navy didn't design pumps. The manufacturers designed the pumps."
Appellants also presented the deposition testimony of Roland Doktor, a manager at Warren Pumps, designated as the person most knowledgeable about issues in this case. When asked "what does it mean to be built to a military specification?" he answered, "There are a certain set of guidelines that are put forward in the specifications as far as materials and properties, testing, things like that, to make sure that the pump will meet the requirements as it needs to be on the ship."
Respondents also called witnesses on this subject. Retired Admiral David Sargent testified about the shipbuilding process. This included the testimony that the Navy and manufacturers engaged in a design process, going back and forth between the Navy and the manufacturer, in which the manufacturer produced drawings for the Navy. This process resulted in Navy specifications.
There was also evidence concerning scientific knowledge of the dangers of asbestos at the relevant times and of respondents', and the Navy's, actual knowledge of the dangers of asbestos;[5] evidence about Patrick O'Neil's disease; damages evidence; and evidence relevant to causation. (Rutherford v.Owens-Illinois, Inc. (1997) 16 Cal.4th 953, 976-977
[67 Cal.Rptr.2d 16, 941 P.2d 1203].)
Crane moved for nonsuit on all causes of action on the ground that there was no evidence that Patrick O'Neil was exposed to asbestos from Crane products, that there was no evidence that any exposure from Crane products was a substantial factor in causing O'Neil's disease, and other grounds. Warren Pumps joined in Crane's motion, and also moved for nonsuit on the ground that there was no evidence that Patrick O'Neil was exposed to asbestos from the maintenance or repair of a Warren pump. *Page 1026 
Neither motion was based on the component parts defense, but questions concerning that defense arose during oral argument on the motions, and the court granted the motions on that basis. The court also found that the pumps and valves were not dangerous or defective except that they included (or were designed to work with) asbestos, and that the release of asbestos was not caused by the normal use of the equipment but by maintenance which was under the supervision of the Navy.[6]
 Standard of Review
Our review is de novo. (Saunders v. Taylor (1996)42 Cal.App.4th 1538, 1541-1542 [50 Cal.Rptr.2d 395].) The judgment may be affirmed only if, interpreting the evidence most favorably to the plaintiff's case and most strongly against the defendant and resolving all inferences and doubts in favor of the plaintiff, no facts have been identified which would justify a judgment in favor of the plaintiff. (Nally v. GraceCommunity Church (1988) 47 Cal.3d 278, 291
[253 Cal.Rptr. 97, 763 P.2d 948].)
 Discussion 1. The component parts defense
"[T]he manufacturer of a product component or ingredient is not liable for injuries caused by the finished product unless it appears that the component itself was `defective' when it left the manufacturer." (Tellez-Cordova v.Campbell-Hausfeld/Scott Fetzger Co. (2004)129 Cal.App.4th 577, 581 [28 Cal.Rptr.3d 744] (Tellez-Cordova).) That is the component parts defense, sometimes called the raw material or bulk supplier defense. As we wrote inTellez-Cordova, "The policy reasons behind the component parts doctrine are well established: `"[M]ulti-use component and raw material suppliers should not have to assure the safety of their materials as used in other companies' finished products. First . . . that would require suppliers `to retain experts in a huge variety of areas in order to determine the possible risks associated with each potential use.'" [Citation.] A second, related rationale is that "finished product manufacturers know exactly what they intend to do with a component or raw material and therefore are in a better position to guarantee that the component or raw material is suitable for their particular applications." [Citations.]' (Springmeyerv. Ford Motor Co. [(1998)] 60 Cal.App.4th 1541, 1554
[71 Cal.Rptr.2d 190].)" (Tellez-Cordova, supra,129 Cal.App.4th at pp. 581-582.)
The trial court found that this defense applied here. We do not. *Page 1027 
Walker v. Stauffer Chemical Corp. (1971)19 Cal.App.3d 669 [96 Cal.Rptr. 803], which is perhaps the first California component parts case, is illustrative. That defendant sold bulk sulfuric acid. One of its customers was a manufacturer of drain cleaner, and the defendant sold the acid with the understanding that its customer would subject it to processes which would render it suitable to be a household product. The customer combined the acid with another product to make drain cleaner. The holding of the case is that the bulk supplier had no duty to the consumer injured when the drain cleaner exploded. The court found that the drain cleaner and the bulk acid were not the same product, and wrote: "We do not believe it realistically feasible or necessary to the protection of the public to require the manufacturer and supplier of a standard chemical ingredient such as bulk sulfuric acid, not having control over the subsequent compounding, packaging or marketing of an item eventually causing injury to the ultimate consumer, to bear the responsibility for that injury. The manufacturer (seller) of the product causing the injury is so situated as to afford the necessary protection." (Id. at pp. 673-674.) Conversely, manufacturers of a defective product which is not altered when it is incorporated into the final product have a duty to the consumer. (Jenkins v. TN PLC (1996)45 Cal.App.4th 1224 [53 Cal.Rptr.2d 642]; Arena v.Owens-Corning Fiberglas Corp. (1998) 63 Cal.App.4th 1178,1187 [74 Cal.Rptr.2d 580] [raw asbestos fibers are not altered when they are incorporated into insulation].)
Lee v. Electric Motor Division (1985)169 Cal.App.3d 375 [215 Cal.Rptr. 195], is the same, although the defendant there did not sell bulk supplies, but manufactured "ordinary, off-the-shelf motors. (Id. at p. 384.) Another manufacturer bought some of those motors to put into its own product, a meat grinder which the defendant had no role in designing. The plaintiff was injured by the meat grinder, and the allegation was that the injury would have been minimized if the motor was designed to stop immediately when turned off. The court found that the defendant was a component part manufacturer and could not be held liable for the defective design of the finished product. (Id. at p. 385.)
The defendant in Fierro v. International Harvester Co.
(1982) 127 Cal.App.3d 862 [179 Cal.Rptr. 923], made a product which was incomplete in itself, and was necessarily going to be incorporated into another product. That is, International Harvester made skeleton trucks which consisted only of an engine, cab and chassis, and in that case, three fuel tanks. These skeleton trucks were made to be modified and could not be used without the customers' modifications. One customer installed a refrigerator unit on the skeleton truck. Five years later, when the modified truck was in an accident, *Page 1028 
the gas tanks caught fire. The injured plaintiff sought a jury instruction on International's duty to design a crash-worthy truck. The trial court refused to give the instruction and the Court of Appeal agreed. One basis of that holding was that skeleton trucks were designed to be modified by another manufacturer, in a manner outside International's control. It was the second manufacturer's design of the final product which was the cause of the injury, superseding any causation involving International's product. (Id. at pp. 867-868; see alsoIn re Deep Vein Thrombosis (N.D.Cal. 2005)356 F.Supp.2d 1055, 1062-1063 [Boeing, which sold nondefective airplanes with no seats, and did not design, manufacture, purchase or select the seats, which were added by the airlines, was not liable for deep vein thrombosis allegedly caused by faulty seat design].)
As In re TMJ Implants Products Liability Litigation
(D.Minn. 1995) 872 F.Supp. 1019, 1026, observed, the component part cases involve "generic or off-the-shelf components," or "building block materials" as opposed to those which are "`really a separate product with a specific purpose and use.'" (Id. at p. 1026, quoting Fleck v. KDI Sylvan Pools,Inc. (3d Cir. 1992) 981 F.2d 107; see alsoTellez-Cordova, supra, 129 Cal.App.4th at p. 581;Springmeyer v. Ford Motor Co., supra,60 Cal.App.4th at p. 1554; Gonzalez v. Autoliv ASP, Inc. (2007)154 Cal.App.4th 780, 788 [64 Cal.Rptr.3d 908].)
Artiglio v. General Electric Co. (1998)61 Cal.App.4th 830 [71 Cal.Rptr.2d 817] (Artiglio), on which the trial court here based its ruling, is no different. In that case, General Electric (GE) supplied bulk silicone to a manufacturer of breast implants. That manufacturer substantially processed the silicone in a manufacturing process over which GE had no control. The silicone was only dangerous when used in medical devices, and GE shipped the product with a disclaimer, disclaiming any responsibility for determining whether the material was suitable for medical applications. GE really had no ability to warn the ultimate user, because it in no way exercised any control over the design, testing or labeling of the implants. Thus, GE was a component parts supplier and was not liable to women who claimed to have been injured by the implants.
In contrast, we found that the defendants inTellez-Cordova, supra, 129 Cal.App.4th 577, were not entitled to the defense. Those defendants made grinders, sanders and saws, which were (according to the allegations of the complaint) specifically designed to be used with abrasive wheels and discs. The plaintiff became ill as a result of airborne toxic substances produced and released from those discs and wheels. We found that the component parts defense did not protect the defendants, because "The facts before us are not *Page 1029 
that respondents manufactured component parts to be used in a variety of finished products, outside their control, but instead that respondents manufactured tools which were specifically designed to be used with the abrasive wheels or discs they were used with, for the intended purpose of grinding and sanding metals, that the tools necessarily operated with those wheels or discs. . . ." (Id. at p. 582.)
The Restatement Third of Torts is in accord. In section 5, titled "Liability Of Commercial Seller or Distributor of Product Components for Harm Caused by Products Into Which Components Are Integrated," it provides that "One engaged in the business of selling or otherwise distributing product components who sells or distributes a component is subject to liability for harm to persons or property caused by a product into which the component is integrated if: [¶] (a) the component is defective in itself, as defined in this Chapter, and the defect causes the harm; or [¶] (b)(1) the seller or distributor of the component substantially participates in the integration of the component into the design of the product; and [¶] (2) the integration of the component causes the product to be defective, as defined in this Chapter; and [¶] (3) the defect in the product causes the harm." (Rest.3d Torts, Products Liability, § 5.)[7]
In comment a, the Restatement defines "components": "Product components include raw materials, bulk products, and other constituent products sold for integration into other products. Some components, such as raw *Page 1030 
materials, valves, or switches, have no functional capabilities unless integrated into other products. Other components, such as a truck chassis or a multifunctional machine, function on their own but still may be utilized in a variety of ways by assemblers of other products." (Rest.3d Torts, Products Liability, § 5, com. a, pp. 130-131.)
We cannot see that respondents' pumps and valves are component parts under this body of law. Component parts manufacturers are exempt from liability because they make multiuse or fungible products, designed to be incorporated into some other product. The component will be substantially altered by the customer, and the manufacturer of the component will have no control over the design of that finished product, or the warnings or labels on those products.
Here, in contrast, respondents did not supply a "building block" material, dangerous only when incorporated into a final product over which they had no control. Instead, respondents made "`separate product[s] with a specific purpose and use.'" (In re TMJ Implants Products Liability Litigation,supra, 872 F.Supp. at p. 1026.) The products were not fungible or multiuse, and were not designed to be altered by respondents' customers. Nor were they altered. Instead, they were used as they were designed to be used, with asbestos insulation and packing which would have to be removed during routine repair and maintenance. Further, unlike the manufacturers in the component parts cases, who had no interaction with the user of the finished product, and no ability to warn, respondents supplied manuals with their products. They had the ability to warn the users of their products.
In the component parts cases, the component manufacturer may not even know what the customer intends to do with the part, and the point of the doctrine is that they need not know. Without such a rule, suppliers would have to hire experts to learn of the dangers of each possible use, in order to understand the risks. (Tellez-Cordova, supra, 129 Cal.App.4th at p. 581.) As the Restatement explains "Imposing liability [on a component parts manufacturer] would require the component seller to scrutinize another's product which the component seller has no role in developing." (Rest.3d Torts, Products Liability, § 5, com. a, p. 131.) But here, respondents knew exactly how their products would be used, and they had a role in developing those products. The policy reasons for the component parts doctrine simply do not apply. As we wrote about the defendants inTellez-Cordova, "respondents are not asked to warn of defects in a final product over which they had no control, but of defects which occur when their products are used as intended. . . ." (Tellez-Cordova, supra,129 Cal.App.4th at p. 583.)
Taylor v. Elliott Turbomachinery Co., Inc. (2009)171 Cal.App.4th 564 [90 Cal.Rptr.3d 414] (Taylor), which was decided after the judgment here, found *Page 1031 
that the component parts defense was applicable to manufacturers similarly situated to respondents, but we think that Taylor misses the mark.
The plaintiff in Taylor, like Patrick O'Neil, worked on an Essex-class aircraft carrier, and was exposed to asbestos from pumps, valves and other equipment. Taylor found, inter alia, that the component parts defense shielded those defendants. In its analysis, Taylor cited the fact that the plaintiff therein acknowledged that the equipment was intended to operate "as part of a larger `marine steam propulsion system.'" (Taylor, supra, at p. 584.)Taylor then cited that plaintiff's argument that the equipment was not multiuse, but was manufactured to the Navy's specifications for a particular purpose, but found the argument unpersuasive. Citing Artiglio, supra,61 Cal.App.4th 830, Taylor ruled that "The mere fact that respondents followed Navy specifications when producing their products does not preclude them from invoking the component parts doctrine." (Taylor, supra, 171 Cal.App.4th at p. 585.)
We reach a different conclusion. The defendant inArtiglio met all the criteria which define a component parts seller. As we have seen, respondents here do not. We also disagree with the finding that the entire steam system of an aircraft carrier (or, as respondents here argue, the ship itself) is a "finished product" as that term is used in the context of the component parts defense. Such a broad definition would make the analysis unworkable. For instance, under the defense, a component maker may be liable if it is substantially involved in the design of the finished product. (Springmeyer v. Ford Motor Co., supra,60 Cal.App.4th at pp. 1551-1552.) If the entire ship, or steam system, were the "finished product," evidence that respondents were substantially involved in the design of their own pumps and valves, and in the integration of that equipment into the rest of ship's systems through insulated flanges, would be inadequate unless appellants could also prove that respondents were involved in the design of the entire steam propulsion system, or of the ship itself. That simply stretches the defense too far.
Nor are we persuaded by Taylor's reference toArtiglio, and customer specifications.Artiglio found that GE was not deprived of the component parts defense merely because it had formulated the silicone to its customer's specifications. (Artiglio,supra, 61 Cal.App.4th at pp. 840-841.) To say that respondents were not deprived of the defense is not to say that they were entitled to it. Indeed, under California law, compliance with a customer's specification is not a defense to a claim of strict products liability. "[T]he uniqueness of a purchaser's order does not alter the manufacturer's responsibilities and is not a defense." (Wright v. StangManufacturing Co. (1997) 54 Cal.App.4th 1218, 1229
[63 Cal.Rptr.2d 422]; see McLaughlin v. Sikorsky Aircraft
(1983) 148 Cal.App.3d 203, 208 [195 Cal.Rptr. 764]; Rawlingsv. D. M. Oliver, Inc. (1979) 97 Cal.App.3d 890, 897
[159 Cal.Rptr. 119].) *Page 1032 
Moreover, we agree with appellants that respondents would not be shielded by the component parts defense even if they were manufacturers of components, because that defense does not apply if the product itself is defective.
The trial court here found that respondents' products were not defective because they posed no danger until the asbestos was disturbed. We cannot see that this is correct. Appellants' design defect case was that respondents' valves and pumps were defective because they were designed to be used with asbestos-containing insulation and packing which would become dangerous during the ordinary and foreseeable use of the products. That is a perfectly acceptable theory. The performance of a product during ordinary, expected and routine maintenance and repair is part of the functionality of that product. A car which only exploded when the oil was changed or the tires rotated could not be deemed nondefective. (See DeLeon v.Commercial Manufacturing Supply Co. (1983)148 Cal.App.3d 336, 344 [195 Cal.Rptr. 867] [intended use of the component included regular cleaning]; Gonzales v. CarmenitaFord Truck Sales, Inc. (1987) 192 Cal.App.3d 1143
[238 Cal.Rptr. 18] [retailer liable for failure to warn with respect to need and method of repair].)
Jones v. John Crane, Inc., supra, 132 Cal.App.4th 990
is instructive. In that case, the plaintiff was exposed to asbestos products, including valve and pump packing materials manufactured by John Crane. He sued for strict liability on a design defect-consumer expectations theory, on evidence that toxic fibers were released during routine use of the products, that is, when packing was replaced. The Court of Appeal affirmed a judgment in the plaintiff's favor, rejecting John Crane's argument that the consumer expectation test was inapplicable because expert witnesses were required. (See also Sparks v.Owens-Illinois, Inc. (1995) 32 Cal.App.4th 461, 465
[38 Cal.Rptr.2d 739] [plaintiff can recover against manufacturer of asbestos insulation on a theory of strict liability based on design defect on the consumer expectations test, on evidence that expected manner of use included removal of insulation from valves for inspection, creating dust].)
 2. "Another manufacturer's product"
Crane's motion for nonsuit was based in part on the evidence that the asbestos which it supplied with its products had been replaced by the time Patrick O'Neil served on the Oriskany.[8]
Crane contended that under California law, it cannot be liable in strict liability for an injury caused by a product it did not manufacture or supply, unless it was involved in the *Page 1033 
vertical distribution of the defective product or played an integral role in the producing and marketing enterprise of that product. (Bay Summit Community Assn. v. Shell Oil Co.
(1996) 51 Cal.App.4th 762, 772-774 [59 Cal.Rptr.2d 322];Peterson v. Superior Court (1995) 10 Cal.4th 1185, 1188
[43 Cal.Rptr.2d 836, 899 P.2d 905].) Warren Pumps joined in the motion.
This was not a ground for the trial court ruling, but the parties heavily brief the issue on appeal, no doubt becauseTaylor found the argument persuasive, at least insofar as the causes of action were based on a failure to warn. We do not.
We begin with basic principles: "This doctrine of strict liability extends to products which have design defects, manufacturing defects, or `warning defects.'" (Sparks v.Owens-Illinois, Inc., supra, 32 Cal.App.4th at p. 472.) A manufacturer is liable in strict liability for an injury caused by the foreseeable use (Daly v. General Motors Corp.
(1978) 20 Cal.3d 725, 733 [144 Cal.Rptr. 380, 575 P.2d 1162]) and misuse of its product (Huynh v. Ingersoll-Rand
(1993) 16 Cal.App.4th 825, 833 [20 Cal.Rptr.2d 296]) and for defective components made by others that are incorporated into their products. "[A] manufacturer of a completed product cannot escape liability by tracing the defect to a component part supplied by another." (Vandermark v. Ford Motor Co.
(1964) 61 Cal.2d 256, 261 [37 Cal.Rptr. 896, 391 P.2d 168].)
Under these principles, respondents would clearly be liable to a sailor who was injured as a result of exposure to the asbestos-containing packing and insulation they supplied with their pumps and valves. Respondents do not contend otherwise. Instead, they seek a different result because O'Neil was injured not by the original packing and insulation, but by replacement parts. In support, they cite cases which do not consider a manufacturer's liability for the components of its products, or for replacement parts, or the kind of interdependent products (valves and pumps along with their insulation and packing) which this case presents. We see nothing in these cases which would cut off respondents' responsibility for failure to warn or design defect, at the point in time at which their products were subject to predictable and ordinary maintenance or repair.
For instance, in Powell v. Standard Brands Paint Co.
(1985) 166 Cal.App.3d 357 [212 Cal.Rptr. 395], the plaintiff used a Standard Brands product for a project, finished the project with another manufacturer's product, then used an electric buffer. The other product exploded, causing the plaintiff's injury. The court held that the explosion of the other product was not a reasonably foreseeable consequence of Standard Brands's failure to warn, and that "the manufacturer's duty is restricted to warnings based on the characteristics of the manufacturer's own products." (Id. at p. 364.) In *Page 1034 Blackwell v. Phelps Dodge Corp. (1984)157 Cal.App.3d 372 [203 Cal.Rptr. 706], a supplier of bulk sulfuric acid filled a customer's tank car with that product, and the plaintiffs were injured in attempting to unload the tank car. They sued the acid supplier on the theory that it should have instructed its customer concerning safe transportation of the acid, and provided warnings on safe unloading procedures. The Court of Appeal held that the acid supplier could not be held liable, because the dangerous product was not the acid, but the tank car. (Id. at p. 378.) In re Deep Vein Thrombosis,supra, 356 F.Supp.2d 1055, the defendant supplied an incomplete product, an airplane without seats, and the injury was alleged to have been caused by the seats, which the defendant did not design, manufacture, or even choose.
Cadlo v. Owens-Illinois, Inc. (2004)125 Cal.App.4th 513 [23 Cal.Rptr.3d 1] is even more remote. That was an attempt to hold a manufacturer of asbestos insulation liable based on its historic role in the design, manufacture and marketing of the product, even though the manufacturer had sold the product line well before the plaintiff's exposure, and there was no evidence that it had any connection, whether design, manufacture or distribution, to the asbestos to which he was exposed. (Id. at p. 516.)
Respondents cannot be analogized to the sulfuric acid supplier, who merely shipped a product in its customer's own choice of transportation, or to the defendants in Blackwell andDeep Vein Thrombosis, which were connected to the alleged dangerous product only by a choice made by the customer. In the cases respondents rely on, the two products were connected by some actor other than the defendant manufacturer, or by time and happenstance, outside the control of the defendant.
In contrast, respondents incorporated asbestos-containing products into their own products, which needed the asbestos-containing products in order to function. The injury was caused by the operation of respondents' products with replacement products which had the same dangerous propensities as the original parts. Respondents' cases do not address that situation. Other cases do. Under those cases, respondents can be held strictly liable for injury caused by dust emanating from replacement asbestos. We believe that that is the correct rule.
In Tellez-Cordova, supra, 129 Cal.App.4th 577, the defendant's tools were designed to be used with attachments, and were useless without them. We thus rejected the defendant's claim that it had no duty to warn about the metal fibers released from the attachments during use, even though the defendant itself did not manufacture the attachments and the defendant's tools did not themselves release fibers. InDeLeon v. Commercial Manufacturing Supply Co.,supra, 148 Cal.App.3d 336, the plaintiff presented evidence that *Page 1035 
the defendant manufactured a bin, which, foreseeably, would have to be cleaned. The plaintiff was injured while cleaning the bin, not by the bin, but by another piece of equipment, to which the plaintiff became vulnerable during the cleaning process. The Court of Appeal found triable issues of fact on the plaintiff's design defect theory, given the triable issues on whether the danger was foreseeable. (Id. at p. 344.) Wright v.Stang Manufacturing Co., supra, 54 Cal.App.4th 1218, is similar. The product, a deck gun, was useful only when installed on a firetruck, but was not designed to accommodate a safe system for attaching the product to the truck.
Under the reasoning of these cases, a manufacturer is liable in strict liability for the dangerous components of its products, and for dangerous products with which its product will necessarily be used. That was appellants' evidence; that respondents incorporated asbestos-containing products into their products and knew those products would over time be replaced with the same kind of product, and that the products were defective because they required asbestos packing and insulation, and because they had no appropriate warnings. We can see no relevance to the fact that the injury was caused by the operation of its product in conjunction with a replacement part which is no different than the original. If respondents had warned the hypothetical original user, or protected that person by avoiding defective design, subsequent users, too, would have been protected.
Again, Taylor is to the contrary.[9] It found that the defendants in that case were not liable for the plaintiff's injury, because the injury "did not come from [the defendants'] equipment itself, but was instead released from products made or supplied by other manufacturers and used in conjunction with [the defendants'] equipment," and that "[a]lthough a manufacturermay owe a duty to warn when the use of its product in combination with the product of another creates a potential hazard, that duty arises only when the manufacturer's own product causes or creates the risk of harm." (Taylor,supra, 171 Cal.App.4th at pp. 579-580.)
We see several flaws in this reasoning. First, becauseTaylor does not seem to distinguish between harm caused by the original packing and insulation and harm caused by replacement parts, the holding is contrary to the rule that a manufacturer is liable for the dangers of its product's components. (Vandermark v. Ford Motor Co., supra,61 Cal.2d at p. 261.) *Page 1036 
Next, Taylor reached its conclusion through what is in our view a misunderstanding of Tellez-Cordova, DeLeon, and Wright, cases which it sought to distinguish.[10]
Taylor wrote that "in Tellez-Cordova, the plaintiff alleged that it was the action of respondents'tools themselves that created the injury-causing dust. Here, in contrast, Mr. Taylor's injuries were caused not by any action of respondents' products, but rather by the release of asbestos from products produced by others. This is a key difference, because before strict liability will attach, the defendant's product must `cause or create the risk of harm.' [Citation.] Second, unlike the abrasive wheels and discs inTellez-Cordova, which were not dangerous without the power of the defendants' tools, the asbestos-containing products at issue in our case were themselves inherently dangerous. It was their asbestos content — not any feature of respondents' equipment — that made them hazardous." (Taylor, supra, 171 Cal.App.4th at pp. 587-589, fn. omitted, original italics.)
This analysis misunderstands the facts ofTellez-Cordova. The allegation in that case was that the defendant's products, although harmless (and useless) without the attachments, were harmful when used as intended. The fact that the respirable dust emanated from the attachments, not the tools, was thus irrelevant. The use of the defendant's "own product" created the harm.
Tellez-Cordova holds that a manufacturer is liable when its product is necessarily used in conjunction with another product, and when danger results from the use of the two products together. That is appellants' evidence here. Asbestos does of course have inherent dangers, but appellants' evidence was that the asbestos incorporated into (and onto) respondents' products caused injury when it was removed. In fact, there was no evidence that the asbestos packing or insulation was dangerous until it was baked on, and removed. (See SanFrancisco Unified School Dist. v. W.R. Grace Co.
(1995) 37 Cal.App.4th 1318, 1325 [44 Cal.Rptr.2d 305] [danger is from friable asbestos].) The danger was caused by the operation of respondents' products. Tellez-Cordova cannot be distinguished. In that case, we observed that the use of attachments with the tools was not mere happenstance. (Tellez-Cordova, supra, 129 Cal.App.4th at p. 584.) Here, too, the use of asbestos, and replacement asbestos, was not happenstance. It was design.
Taylor sought to distinguish DeLeon v. CommercialManufacturing Supply Co., supra, 148 Cal.App.3d 336, by emphasizing that in that case, there were disputed issues of fact concerning the defendant's role in the *Page 1037 
design and location of its product. (Taylor, supra,171 Cal.App.4th at pp. 589-590.) That was an issue inDeLeon, but it is also an issue here. Appellants presented evidence that through the "back and forth" process of the Navy's design and procurement system, respondents substantially contributed to the design of their pumps and valves, and to the integration of those pumps and valves, with asbestos-insulated flanges, into the rest of the equipment on the Oriskany.
Taylor sees Wright v. Stang Manufacturing Co.,supra, 54 Cal.App.4th 1218, as a case about foreseeable misuse of a product, or as a case about a design defect in the defendant's own product, and thus as irrelevant to the facts ofTaylor. But the design defect in Wright
concerned the product's fitness for use with another, necessary, product. The case is thus identical to this one. In sum, we believe that Taylor was wrongly decided, and that nonsuit here was wrongly granted.
 3. Warren's nonsuit motion
Warren also moved for nonsuit on the theory that there was no evidence from which a jury could conclude that Patrick O'Neil had been exposed to asbestos from its products. That was not a ground for the trial court ruling, Warren again urges the theory on appeal.[11] We find sufficient evidence to defeat nonsuit. Appellants presented evidence that Warren pumps were aboard the Oriskany, that the pumps used asbestos for insulation and packing, that removal of the asbestos and packing when the pumps were serviced created dust, and that O'Neil was in the machine rooms when the pumps were serviced. That is a circumstantial case that O'Neil was exposed to asbestos from Warren products, and a circumstantial case is enough. (Lineaweaver v. PlantInsulation Co. (1995) 31 Cal.App.4th 1409
[37 Cal.Rptr.2d 902] [evidence that the defendant was the exclusive distributor of certain asbestos insulation in the relevant geographical area and supplied about half of the asbestos insulation to the refinery where the plaintiff worked for many years, and that the plaintiff worked with and around asbestos insulation at the refinery, was sufficient].) *Page 1038 
 Disposition
The judgment is reversed. Appellants to recover costs on appeal.
Mosk, J., and Kriegler, J., concurred.
[1] In summarizing the facts on this appeal from judgment after nonsuit, we disregard conflicting evidence, give appellants' evidence all the value to which it is legally entitled, and indulge every legitimate inference which may be drawn from the evidence in appellants' favor. (Elmore v.American Motors Corp. (1969) 70 Cal.2d 578, 583
[75 Cal.Rptr. 652, 451 P.2d 84].)
[2] The Revolutionary War Battle of Oriskany took place in August of 1777, in New York's Mohawk Valley.
[3] On nonsuit, the trial court found that Crane provided only bonnet gaskets, that those gaskets were not shipped with asbestos, that any insulation was added later, by the Navy, and that Crane had no control over the materials used to insulate its gaskets. Appellants, who agree that asbestos insulation was applied to some gaskets by the shipbuilder after the valves were installed, contend that the trial court improperly weighed the evidence to make this finding. We agree. The evidence was that some Crane valves involved bonnet gaskets which did not use asbestos, but that other Crane valves had different gaskets, which did include asbestos.
[4] Crane knew all of this. It sold asbestos-containing packing and insulation to its customers, for maintenance and repair work. Its corporate representative testified that Crane was a manufacturer, seller, and distributor of asbestos-containing products.
[5] As another court observed "The unpalatable facts are that in the twenties and thirties the hazards of working with asbestos were recognized; that the United States Public Health Service documented the significant risk in asbestos textile factories in 1938; that the Fleischer-Drinker report was published in 1945; that in 1961 Dr. Irving Silikoff and his colleagues confirmed the deadly relationship between insulation work and asbestosis." (Borel v. Fibreboard Paper ProductsCorp. (5th Cir. 1973) 493 F.2d 1076, 1106; see alsoJones v. John Crane, Inc. (2005) 132 Cal.App.4th 990,1004 [35 Cal.Rptr.3d 144].)
[6] We cannot agree with Warren Pumps that either motion for nonsuit was based on a sophisticated intermediary theory or that the trial court granted nonsuit on that ground.
[7] In reliance on a draft of the Restatement Third of Torts,Artiglio, supra, 61 Cal.App.4th at page 839 included the customer's sophistication as a factor in determining whether the component parts doctrine applied. Citing Artiglio, the trial court here made findings about the Navy's sophistication as a purchaser and seems to have based its ruling in part on that ground. In its final version, the Restatement Third of Torts considers the component buyer's sophistication only in its discussion of the component seller's duty to warn that buyer of a defect, writing that "The component seller is required to provide instructions and warnings regarding risks associated with the use of the component product. See §§ 1 and 2(c). However, when a sophisticated buyer integrates a component into another product, the component seller owes no duty to warn either the immediate buyer or ultimate consumers of dangers arising because the component is unsuited for the special purpose to which the buyer puts it. To impose a duty to warn in such a circumstance would require that component sellers monitor the development of products and systems into which their components are to be integrated. See Comment a. Courts have not yet confronted the question of whether, in combination, factors such as the component purchaser's lack of expertise and ignorance of the risks of integrating the component into the purchaser's product, and the component supplier's knowledge of both the relevant risks and the purchaser's ignorance thereof, give rise to a duty on the part of the component supplier to warn of risks attending integration of the component into the purchaser's product. . . ." (Rest.3d Torts, Products Liability, § 5, com. b, p. 132.) Thus, under the Restatement, a seller seeking the shield of the component parts defense isnot required to prove that it sold to a sophisticated customer. We believe that that is as it should be, and that (in this case) the Navy's sophistication is not significant. As we observe elsewhere herein, the point of the doctrine is that a manufacturer should not have to investigate and evaluate its customer's sophistication before it can sell its component product.
[8] Although Crane did sell replacement parts, appellants did not attempt to prove that the packing and gasket insulation on the Oriskany at the time had been purchased from Crane.
[9] Taylor also engaged in an analysis underRowland v. Christian (1968) 69 Cal.2d 108
[70 Cal.Rptr. 97, 443 P.2d 561], and determined that those defendants were not liable under a negligence theory because they did not owe the plaintiff a duty of care. Appellants make arguments about that point, but we need not consider it, because respondents did not move for nonsuit on that ground.
[10] Taylor also relied on foreign state authority, companion cases Braaten v. Saberhagen Holdings (2008)165 Wn.2d 373 [198 P.3d 493] and Simonetta v. Viad Corp.(2008) 165 Wn.2d 341 [197 P.3d 127]. They suffer from the same flaws as does Taylor.
[11] Appellants argue that because Warren failed to obtain a ruling on the issue, it may not raise it on appeal. There is a split of authority on the question (Alpert v. Villa RomanoHomeowners Assn. (2000) 81 Cal.App.4th 1320, 1328, fn. 8 [96 Cal.Rptr.2d 364]), but we need not add to the length of this long opinion by delving into it, because even if the issue is considered, Warren was not entitled to nonsuit on this ground. At the same time, we reject Warren's contention that appellants waived this issue by failing to raise it in their opening brief. Because the court made no ruling on the question, we do not see that appellants were obliged to raise the issue in their opening brief. *Page 1039